EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.*
ALEJANDRO DUMAS MÁRQUEZ, acusado y apelante.

Número 16226.

*Sometido:* 11 de diciembre de 1957. *Resuelto:* 19 de abril de 1961.

418

Santos P. Amadeo, Augusto Burgos Mundo y Edgardo Álvarez Quintana, abogados del apelante; J. B. Fernández Badillo, Secretario de Justicia Interino y Arturo Estrella, Fiscal, Tribunal Supremo, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Alejandro Dumas Márquez fue acusado ante la Sala de San Juan del Tribunal Superior por ataque para cometer asesinato. Alegó ser no culpable y solicitó juicio por jurado. Celebrado el juicio, el jurado rindió veredicto unánime de culpabilidad. Solicitó por moción escrita la anulación del proceso y del veredicto y la celebración de un nuevo juicio. Fue denegada esa moción y el tribunal dictó sentencia imponiéndole una pena indeterminada de dos a quince años de presidio.

No conforme, apeló de la resolución denegando dicha moción y de la sentencia. Señala un solo error en los siguientes términos:

"La corte sentenciadora erró al declarar sin lugar la moción solicitando la anulación del proceso, veredicto, y sentencia en la cual se alegaba que al acusado se le había privado del derecho a un juicio imparcial garantizado por la Enmienda Quinta de la Constitución de los Estados Unidos y el Artículo II, Sección 7 de la Constitución del Estado Libre Asociado de Puerto Rico, ya que el Fiscal no ofreció en evidencia durante el proceso la confesión del acusado que este funcionario permitió que fuera publicada en la prensa del país."

La controversia en este recurso se ha limitado a la procedencia de la moción solicitando la anulación del proceso y del veredicto y la concesión de un nuevo juicio. Para el mejor entendimiento de los hechos en que fundó el apelante su planteamiento, transcribimos a continuación todo lo que en el cuerpo de la moción se dice:

"Moción solicitando anulación del proceso y veredicto.
"Al Hon. Juez . . .

"Comparece el acusado por conducto de los abogados que suscriben y respetuosamente alega, expone y solicita:

"1. Que el día 7 de enero de 1955 apareció publicado en el periódico El Imparcial, Núm. 8454, tomo 228, la siguiente información relacionada con el acusado. Dicha información que está

firmada por Frank Rodríguez, redactor de El Imparcial, dice lo siguiente:

" 'CONFIESA ATRACADOR DE DAMA DE HATO REY.—*Quebrada su voluntad ante el recuerdo de una mujer hermosa que caía abatida bajo su bestial ataque a palos, el ex jockey Alejandro Dumas, alias "Popeye", admitió en el mismo escenario de los hechos haber agredido a Emma Pujals Quiñones, descargando sobre ella toda la ira que sentía contra su suegro Benito Casals, al que sí pensaba agredir con la estaca.*—Como informó El Imparcial en su edición del jueves, la investigación que se inició desde que Emma fue atacada estaba a punto de cumplir sus objetivos, y tal como lo adelantamos, a la hora en que esa edición estaba en manos de los lectores se estaba produciendo el arresto que anunciamos.—La detención de "Popeye" Dumas se practicó en un colmado de Caparra Heights, donde trabajaba, por los detectives José Martínez y Leonides Guzmán, quienes actuaban bajo la dirección del capitán Jorge Camacho y del fiscal Ernesto Mieres Calimano. Acto seguido se le condujo hasta donde el ingeniero Manuel González Seijo, quien sin titubear identificó a Dumas como el individuo con el que había conversado la noche del sábado, poco antes del suceso, y que llevaba en sus manos la estaca.—*No obstante la identificación de González Seijo, el ex jockey Dumas seguía negando insistentemente los hechos; pero poco después al ser llevado al escenario del suceso, sufrió un sacudimiento general en su cuerpo y comenzó a relatar cuanto sucedió aquella trágica noche, admitiendo los hechos.*—Discutió con suegro.—'comenzó diciendo Dumas que en la noche del sábado sostuvo una acalorada discusión con su suegro Casals, en la calle José Martí número 114, Hato Rey, y asegura que salió a quejarse en el Cuartel. En el camino —según dijo—se encontró un madero, al que echó manos y siguió caminando por los alrededores de la Iglesia del Espíritu Santo. Pensaba si ir a querellarse al Cuartel o si volver a casa de su suegro para pegarle unos cuantos palos. Estaba iracundo. *En esos momentos, poco después de las 10:00 Dumas vio a una elegante dama que se acercaba y le preguntó por la hora. Afirma que la dama (Emma Pujals Quiñones) en tono destemplado y altanero le respondió que no podía darle la hora 'a un cualquiera', a lo que Dumas asegura haberle dicho que él no era un bandido. Sigue relatando el ex jockey que entre él y Emma surgió una discusión, en medio de la cual por el estado*

*de soberbia en que se encontraba, le propinó un palo. Ella se tambaleó y gritó, pero rápidamente él le propinó un segundo palo, ya ciego de ira, al tiempo que decía: 'Eso es para que no grites'. No recuerda si siguió pegándole o no, pero sí afirma que cuando ella quedó tendida en la calle, la recogió para evitar que un automóvil la fuera a destrozar, y la arrastró hasta el solar baldío dentro del cual fue encontrada.—*Sigue explicando "Popeye" que luego recogió la cartera de Emma, de la que sacó unos cuantos billetes. Tiró la cartera en el solar en que luego fue encontrada y más adelante, detrás del Colmado Quintana, dice que rompió los billetes de banco y los tiró. Afirma de manera categórica que no se trataba de robo, ni de cosa parecida.—*Padece de la Mente.*—Explicados los movimientos que realizó esa noche, después de la comisión del hecho, "Popeye" insistió en que su intención era la de agredir a su suegro, Benito Casals, y entonces reveló que hace algún tiempo padece de la mente, y que debido a una lesión pulmonar está recibiendo tratamiento en el Sanatorio Estatal. El Imparcial comprobó que en efecto "Popeye" había estado recluido en el Sanatorio, aunque no pudo comprobar que recibe tratamiento siquiátrico. No obstante el hecho de que el Juez Víctor Parés Collazo acusó a Dumas de ataque para cometer asesinato y portación de armas, señalándole $11,000 de fianza, algunas de las autoridades investigadoras no creen terminada su labor, pues parece preocuparles el otro individuo, aun no localizado, que poco después de la agresión de Emma fue al Cuartel de Hato Rey a inquirir sobre el estado de la herida.—*Sigue Mejorando.*—Por otra parte, en el Hospital Municipal de Río Piedras se informó el jueves por la mañana que Emma Pujals Quiñones no ha recobrado el conocimiento, pero se ha producido una pequeña mejoría dentro de su estado de gravedad. Asimismo se informó que el doctor Nathaniel Rifkinson, neurocirujano del hospital, sigue observándola con atención. Aclarando una información que se había dado, en cuanto a que Emma había sido objeto de una operación, el doctor F. A. Battle dijo que seguramente hubo una mala interpretación, pues lo que ocurrió fue que a la paciente se le hicieron las suturas, y aseguró que hasta el presente el doctor Rifkinson no ha considerado siquiera la posibilidad de una operación.' (Páginas 3 y 27.)

"2. Que en la página del mismo periódico aparece una información gráfica con el siguiente título: 'EX JOCKEY CONFIESA

ATRACO A DAMA.' En dicha información aparecen dos fotografías con los siguientes títulos: 'AGRESOR Y EL ARMA. *Alejandro Dumas Márquez, alias "Popeye" carga sobre sus hombros la estaca con que confiesa asestó violentos golpes a Emma Pujals Quiñones, en la noche de Año Nuevo, en Hato Rey,* dejándola inconsciente, estado en que aún se encuentra. "Popeye" dice que a quien pensaba agredir con la estaca era a su suegro, Benito Casals.'—La otra fotografía tiene como título lo siguiente: 'CONFIESA HECHOS.—*Bajo el interrogatorio del fiscal Mieres Calimano (izquierda) quien le muestra la estaca utilizada para agredir a Emma Pujals, el ex jockey Alejandro Dumas Márquez, se confiesa autor de los hechos, en el cuartel de la Detective de San Juan. Observa de pie el capitán Jorge Camacho, de la Detective.'* (Información y otra foto en pág. 3.)

"3. Que en la página 3 de dicho periódico aparece también otra fotografía que tiene el siguiente título: 'FIRMA CONFESIÓN. —*Alejandro Dumas (derecha) firma su confesión ante el fiscal Mieres Calimano (izquierda). Observa el capitán Jorge Camacho (detrás).'*

"4. Que en el periódico El Mundo, edición del 6 de enero de 1955, Núm. 13513, edición final, aparece la siguiente información sobre el acusado, firmada por Enrique Ramírez Brau, redactor de El Mundo: 'EX JOCKEY ADMITE ATACÓ A ESTACAZOS SRA. EMMA PUJALS.'—'TRAS ASALTO LE ARREBATÓ LA CARTERA. VECINO FLORAL PARK LO IDENTIFICÓ AYER.—La detective arrestó anoche a Alejandro Dumas Márquez como el autor del asalto contra la señora Emma Pujals Quiñones en Floral Park, el pasado sábado por la noche. *Se informó que Dumas Márquez, un ex jockey, de unos 30 a 35 años de edad, admitió los hechos después que Manuel González Seijo lo identificó como el individuo que había tratado de robarle la antena a su automóvil.* Según la información ofrecida anoche, Dumas Márquez, uno de los sospechosos que investigaba la detective, fue llevado ante González Seijo por el capitán Jorge Camacho de la detective, quien lo había arrestado. Lo llevaron a la residencia de González Seijo, donde González lo identificó como el individuo que llevaba una estaca en las manos en la noche del sábado pasado. Dijo González que no tenía dudas que ése era el individuo con quien él habló a las nueve y media de la noche, media hora antes de ser asaltada la señora Pujals.—*Al principio Dumas negó los hechos, pero poco después admitió ser el individuo de la estaca,*

*y el incidente con el carro de González.* Entonces el capitán
Camacho condujo al detenido hasta el solar donde fue encon-
trada la señora Pujals. *Al ver el sitio fue que Dumas Márquez
admitió los hechos. Según la información ofrecida, he aquí el
relato hecho por Dumas Márquez: 'Después del incidente con
González, siguió calle abajo, cuando vio a la señora Pujals, que
iba por la acera. Se le acercó, preguntándole la hora. Ella le
contestó airadamente con un 'so atrevido, ninguna hora . . .'
Él entonces le dio un estacazo a la vez que le echaba una mal-
dición. Cuando ella gritó por el golpe, él le volvió a dar otro
golpe, con una exclamación de 'para que no grites'. Al segundo
golpe, Emma Pujals cayó a la calle, y él la arrastró al solar
'para que no la pisara un carro'.* Dumas luego vio la cartera
en la calle, la cogió, y luego tiró la estaca al patio de la casa
frente al solar vacío. Siguió andando mientras registraba la
cartera. Cogió los billetes que encontró, los rompió y los lanzó
detrás del Colmado Quintana. La cartera la tiró luego en un
solar vacío, en la Calle Guayama donde está el Colmado Quin-
tana.—La cartera fue encontrada allí al otro día por unos
muchachos. Dumas fue llevado por Camacho y otros detectives
para que fuera reconstruyendo todo el trayecto, desde que
abandonó el carro de González Seijo, por toda la calle Ruiz
Belvis, hasta el solar donde ocurrió la agresión. Luego siguió
por la Calle Guayama, doblando un callejón, hasta que se alejó
de aquellos alrededores. Emma Pujals continuaba ayer re-
cluida en el Hospital Municipal de Río Piedras sin haber
recobrado el conocimiento desde el sábado a las 10:00 p.m.
cuando fue víctima de los golpes que le propinó Dumas.—Ale-
jandro Dumas es natural de Río Piedras. Fue arrestado en la
Plaza Provision de Caparra Heights, ayer al mediodía, por los
detectives José Martínez y Leonides Guzmán. La primera pista
sobre Dumas Márquez la dio una persona que antes del inci-
dente de la antena con el señor González Seijo vio al ex jockey
con una estaca en la mano, invitando a un muchachito a pasear
con él. *Anoche el fiscal Ernesto Mieres Calimano, quien con-
duce la investigación desde el mismo sábado por la noche, estaba
tomando declaraciones juradas a Dumas en el cuartel de la Poli-
cía en la calle San Francisco de San Juan. Dumas insistió en
varias ocasiones al hablar con el fiscal, que había roto los bille-
tes diciendo que 'no era asunto de dinero'. Hablando con un
periodista, Dumas admitió que durante las primeras horas de*

424

*la noche había tomado vino, cerveza y ron.*—(Pág. 1 y pág. 10, Col. 2.)

"5. Que en el periódico El Mundo de enero 7 de 1955, Núm. 13,515, aparece la siguiente información sobre el acusado: 'DUMAS MÁRQUEZ NIEGA ROBO FUERA CAUSA DE LA AGRESIÓN' *'La captura del jockey Alejandro Dumas Márquez, de 22 años, quien agredió brutalmente con una estaca a la señora Emma Pujals, se debió a* una confidencia que recibió la detective en el sentido de que Dumas antes del incidente con don Manuel González Seijo, andaba con una estaca y había invitado a un menor a pasear con él.—'El cabo José Martínez y el detective Leonides Guzmán enterados del nombre de Dumas dirigieron sus pesquisas a localizarlo y lo arrestaron en la Plaza Provision de Caparra Heights, donde trabajaba. El Juez del Tribunal Nocturno Víctor Parés Collazo, acusó a Alejandro Dumas Márquez, quien admitió los hechos, de ataque para cometer asesinato y portación de armas, fijándole fianzas de $10,000, respectivamente.—*Dumas, alias "Popeye", quien fue arrestado el pasado jueves a mediodía, declaró que a eso de las 9:45 de la noche del pasado sábado mientras caminaba por la calle Ruiz Belvis de Floral Park, se le acercó a la señora Emma Pujals Quiñones para preguntarle la hora que era. Alegó Dumas que la señora Pujals le contestó que 'no le daba la hora a ningún títere o bandido, so atrevido.' Dumas entonces, según su declaración, le pidió perdón a la Pujals, y ésta respondió 'no perdono a ningún títere o bandido, so atrevido.' Fue entonces que Dumas con la estaca que portaba le agredió en la cabeza. Al gritarle dijo él una maldición y volvió a darle otro estacazo, cayendo ella al pavimento. También manifestó Dumas que para que no la pisara un automóvil él la arrastró hasta el solar vacío, frente à la Iglesia del Espíritu Santo.—Botó la cartera.—Dumas* declaró que cogió la cartera de Emma Pujals y caminó con ella hasta la calle Guayama donde la registró, rompió unos papeles y un billete y los pedazos los tiró detrás del Colmado Quintana, en la misma calle. La cartera la tiró a un solar vacío. *Agregó Dumas que la agresión no fue movida por ningún interés monetario.* En su declaración al fiscal Ernesto Mieres Calimano, que lo interrogó en el cuartel de la calle San Francisco, Dumas dijo que no recordaba cómo iba vestida la señora Emma Pujals. Declaró que había sido jockey oficial hasta el 1952 y corría los caballos de las cuadras de los señores Catín Coll Pujols, Miguel

Elías y Mario Mercado. Fue jockey durante cuatro años. Que había sufrido una caída del caballo Fajardo, recibiendo un golpe en la cabeza. Más tarde se cayó de una yegua lesionándose un pulmón por lo que ha venido tratándose en el Hospital de Tuberculosis donde estuvo una vez interno.—Dumas es casado con Carmen Casado, quien tiene cuatro meses de embarazo, y residen en la Calle José Martí, 114, de Hato Rey. Relató el incidente que tuvo con el señor Manuel González Seijo como de 9 a 9:15 de la noche del sábado 1ro. del corriente en la Calle Duarte, esquina a la Seín, de Floral Park. Alega que unos muchachos le fueron a decir a González Seijo que él se quería llevar la antena de su carro, lo que no era cierto. Dijo que cuando caminaba por la calle zigzagueando le dio un bandazo al vehículo. 'Eso fue lo que ocurrió' agregó que estaba bastante 'picao'. 'Había tomado cerveza, un vaso de vino y un palo de ron', dijo. Al ser llevado a presencia del señor González Seijo éste lo identificó como la persona con la que había hablado y discutido sobre el caso de la antena y lo había visto portando una estaca que describió a la policía. Dumas por su parte declaró que la estaca la había tirado entre unas pabonas de la residencia de la señora Carmen Prado de `Rodríguez, adyacente al solar vacío donde el policía Hernández de Hato Rey la encontró. Fue en ese solar vacío que la policía encontró a Emma Pujals gravemente herida.—*Bajo Tratamiento.*—Dumas no admitió los hechos inmediatamente que fuera arrestado, sino bien tarde en la noche a los agentes cabo Martínez y detective Guzmán. Poco después fue conducido por el capitán Jorge Camacho Torres al escenario de los hechos donde paso a paso fue reconstruyendo sus actos. El capitán Camacho Torres ocupó el pantalón azul, la camisa en forma de guayabera que vestía Dumas la noche de autos y la estaca con la que agredió a la señora Pujals, todo lo cual ha sido enviado al laboratorio de la Policía para análisis. Dumas mostró a la Policía y a los representantes de la Prensa un certificado del Asilo de Tuberculosis donde aún recibe tratamiento médico. Sufre, dijo, de hemorragias nasales. El fiscal Ernesto Mieres Calimano, quien tomó declaraciones a Dumas Márquez y al ingeniero Manuel González Seijo y en el Tribunal Nocturno manifestó al Juez Víctor Parés Collazo que no había podido establecer el robo como el móvil de los hechos y sí un caso de ataque para cometer asesinato. El Juez Parés procedió entonces a acusar a Dumas

Márquez de ataque para cometer asesinato y portación de armas, fijándole fianzas de $10,000 y $1,000 respectivamente. El Juez Parés alegó que consideraba la estaca a la luz de la interpretación que hacía del Código Penal como un arma, que al igual que el garrote, podía causar grave daño a una persona o causarle la muerte. El acusado ingresó a las 2 de la madrugada en la cárcel La Princesa. (Pag. 1 y 10, Col. 3.)

"6. Que en la página 1ra. del mismo periódico aparece una fotografía relacionada con el acusado, que tiene el siguiente título: 'Alejandro Dumas Márquez señala el callejón que conecta Floral Park con la Calle Guayama y por el cual huyó luego de atacar a la señora Emma Pujals. Aparecen los detectives José Martínez y Leonides Guzmán, que lo arrestaron y vecinos del lugar. (Foto El Mundo, por Luis Casenave.)'

"7. Que en la página 4, del mismo periódico aparecen tres fotografías relacionadas con el acusado, que tienen el siguiente título de información: 'Alejandro Dumas muestra a la detective cómo asaltó a la señora Emma Pujals en la noche del sábado pasado. En la primera foto, el capitán Camacho interrogaba a Dumas en el solar donde ocurrió el ataque, sobre la forma en que manipuló la estaca con que atacó a la señora Pujals. (2) Dumas Márquez enseña al capitán Camacho cómo arrastró a su víctima hasta el solar luego de asestarle varios estacazos. (3) Dumas muestra cómo escondió la estaca entre unos arbustos contiguos al solar. Más información en la primera página. (Foto El Mundo por Luis de Casenave.)'

"8. Que el 10 de marzo de 1955 el Fiscal Ernesto Mieres Calimano radicó una acusación contra el acusado ante este Tribunal acusándolo de un delito de ataque para cometer asesinato.

"9. Que el día 11 de marzo de 1955 se leyó la acusación al acusado y éste se declaró inocente y solicitó juicio por jurado.

"10. Que el día 16 de junio de 1955 se celebró la vista del caso contra el acusado, y después de desfilar la prueba del pueblo el jurado lo declaró culpable del delito que se le imputaba.

"11. Que durante la insaculación del jurado todos y cada uno de ellos declararon a preguntas de la defensa que habían leído la información que los periódicos de Puerto Rico habían publicado en relación con el delito que se le imputaba al acusado.

"12. Alega el acusado que el procedimiento seguido por él (sic), así como el veredicto del jurado son nulos e ineficaces por los siguientes fundamentos:

"*A*. Porque durante la investigación del crimen por el cual fue acusado este peticionario, tanto el Fiscal como funcionarios de la policía le dieron información a la Prensa en el sentido de que éste había confesado el delito que se le imputaba y otros detalles del crimen que perjudicaron grandemente el derecho constitucional del acusado a un juicio imparcial.

"*B*. Porque tanto el Fiscal como los funcionarios de la policía permitieron que la Prensa tomara fotografías del acusado en las cuales éste aparecía confesando el delito así como otras fotografías relacionadas con el crimen que se le imputaba al acusado privándole así del derecho a un juicio imparcial.

"*C*. Que aunque el Fiscal y la Policía le dieron a la Prensa detalles sobre la supuesta confesión del acusado y la Prensa publicó fotografías del fiscal y del acusado en las cuales éste aparecía firmando la supuesta confesión, sin embargo, el fiscal no presentó en evidencia dicha confesión la cual fue leída por los miembros que constituyeron el jurado que juzgó al acusado.

"*D*. Que el Fiscal al no presentar en evidencia la supuesta confesión del acusado le privó a éste del derecho a un juicio imparcial, ya que habiendo sido dicha confesión leída por las personas que formaron parte del jurado, sin embargo, no le dieron una oportunidad al acusado de obligar al Fiscal a probar que dicha confesión fue involuntaria (sic) y de poder presentar también evidencia en el sentido de que dicha confesión fue obtenida por coacción física y moral.

"13. Que todo lo anteriormente hecho fue en violación de las enmiendas 5 y 14 de la Constitución de los Estados Unidos, así como del Artículo II, Sección 7 de la Constitución del Estado Libre Asociado de Puerto Rico.

"POR TODO LO CUAL el acusado respetuosamente solicita de este Tribunal que anule el proceso, así como el veredicto del jurado y le conceda un nuevo juicio."

Sobre la moción fue celebrada una vista en la que el acusado ofreció, y el tribunal de instancia admitió, varios recortes de periódicos cuyos textos concuerdan con los que se insertan en la moción. La resolución recaída y apelada es como sigue:

"RESOLUCIÓN.—El acusado en este caso fue juzgado por jurado y declarado convicto de un delito de ataque para cometer asesinato. Se nos pide ahora que se anule el proceso y el veredicto porque durante la investigación del crimen le suministraron información a la prensa, que ésta publicó, en el sentido de que el acusado había confesado el delito y otros detalles del crimen y que esta información fue dada en la prensa por medio de relatos, que se transcriben en la Moción de Nulidad, y fotografías en que el acusado aparecía firmando una supuesta confesión. Se alega, además, en la moción que el Fiscal, al no presentar en evidencia la supuesta confesión del acusado, le privó a éste de un juicio imparcial y que todas las actuaciones de publicidad violan las Enmiendas V y XIV de la Constitución de los Estados Unidos y el Artículo 2, Sección 7, de la Constitución del Estado Libre Asociado de Puerto Rico.

"En el juicio, y al constituirse el jurado, se preguntó a éstos ampliamente sobre si tenían o no opinión formada y si habían o no leído la prensa en relación con los relatos que hacían sobre el caso. Los jurados que quedaron y constituyeron el panel que resolvió el caso, todos manifestaron que, a pesar de lo que habían leído en los periódicos, estaban en situación y posición de resolver el caso imparcialmente.

"El Fiscal ofreció prueba testifical de testigos presenciales, como la propia agredida, y otros testigos que vieron al acusado en los alrededores del sitio y además declararon sobre detalles y circunstancias. El Fiscal no presentó como prueba una confesión del acusado. Si la tenía, creyó prudente no ofrecerla. Quizá para evitarse discutir cualquier cuestión que pudiera levantar el acusado en cuanto a la publicidad que dicha confesión había tenido en la prensa. El acusado no presentó teoría ni prueba de clase alguna.

"No hay duda de que las informaciones de los periódicos pueden afectar a los jurados y hasta al juez que entiende en la vista de un proceso criminal en tal forma que lo pueden incapacitar para resolver las cuestiones en controversia y garantizarle al acusado un juicio imparcial.

"Si los jurados que entendieron en este caso mintieron al decir que podían, a pesar de las informaciones que leyeron en la prensa, resolver imparcialmente el caso, es cuestión que no podemos resolver porque no está ante nosotros ni hay prueba alguna que tienda a demostrarlo. Tenemos, por tanto, que

admitir que el jurado fue imparcial en la apreciación de la prueba especialmente cuando no hubo prueba del acusado y el caso se sometió únicamente con la prueba de cargo, que era incriminatoria.

"Si el Fiscal y la Policía dieron información a la prensa de que el acusado había confesado y otras circunstancias y detalles del delito mientras estaba éste en proceso de investigación, se ha resuelto ya por nuestro Honorable Tribunal Supremo que constituye una mala práctica. Si por el contrario ni el Fiscal ni la Policía dieron información a la prensa pero ésta averiguó y publicó hechos o conjeturas sobre actos criminales que tenían, sin duda, interés público, no sabemos cómo esto pueda ser evitado en vista del derecho constitucional de libertad de prensa.

"Por las razones anteriormente expuestas, debe declararse sin lugar la moción solicitando anulación del proceso y veredicto y debe señalarse fecha para dictar sentencia."

La cuestión a resolver es si la publicidad dada por la prensa a los detalles del crimen y a una alegada confesión del apelante y la omisión del fiscal al no ofrecerla como evidencia en el juicio por jurado, privaron realmente al acusado de su derecho constitucional al debido proceso de ley o si, por el contrario, en todas las fases del proceso él disfrutó a plenitud de todas las protecciones y garantías consagradas por la Constitución de Estados Unidos y la de Puerto Rico.

Primeramente expondremos en forma amplia y objetiva todos los hechos y circunstancias reflejados por los autos, posteriores al arresto del acusado y a las informaciones publicadas por la prensa. —Los relativos a la comisión del delito imputado y los ocurridos después y hasta la presentación de la acusación aparecen en el resumen de la prueba que más adelante se transcribe. —Luego trataremos la cuestión planteada.

I

El 10 de marzo de 1955 el fiscal presentó ante la Sala de San Juan del Tribunal Superior la acusación contra Alejandro Dumas Márquez por ataque para cometer asesinato, alegándose que se cometió dicho delito de la manera siguiente:

"El referido acusado Alejandro Dumas Márquez, allá, en, o para el día 1 de enero de 1955 y en Hato Rey, Río Piedras, Puerto Rico, que forma parte del Tribunal Superior de Puerto Rico, Sala de San Juan, ilegal, voluntaria y maliciosamente, con premeditación y propósito deliberado y firme de darle muerte, acometió y agredió con un pedazo de madera (cuartón de madera), al ser humano nombrado Emma Pujals Quiñones, infiriéndole varias contusiones de carácter grave, con la intención allí y entonces de cometer asesinato."

Al dorso de la misma aparece una lista de quince testigos y sus respectivas direcciones. Por moción del fiscal fechada el 23 de marzo se adicionó a esa lista el nombre de la señorita Emma Pujals Quiñones y el lugar de su residencia, que no aparecían en la lista original.

Se dio lectura a la acusación el 17 del mismo mes de marzo y en ese acto, el acusado, representado por sus dos letrados, formuló alegación de no culpable y solicitó juicio por jurado, señalándose su celebración para el día 23 de mayo siguiente. El 4 de abril prestó fianza provisional y fue excarcelado. Nunca solicitó el traslado del caso.

El 23 de mayo, al ser llamado el caso para juicio sus dos letrados solicitaron la posposición del juicio "por no estar preparados por tener que localizar ciertos testigos." El tribunal le concedió la posposición y fijó de nuevo el juicio para el 16 de junio de 1955.

Por mociones que fueron presentadas los días 17 de mayo y 6 y 14 de junio, sus letrados pidieron y obtuvieron la citación, como testigos suyos "esenciales para su defensa", de Ismael Dumas Márquez, Miguel Ángel Ortiz, Eugenio Enrique Toro Calero y Justo Enrique Colón.

## II

El juicio ante jurado comenzó en la mañana del día de su final señalamiento, 16 de junio de 1955, y se terminó en el día siguiente, estando El Pueblo representado por el mismo fiscal que practicó la investigación del caso y el acusado por sus dos letrados. Al llamarse "Las partes anunciaron estar

listas para juicio, y el tribunal ordenó la constitución del jurado. . . ." —t. 1.

Para la selección del jurado fueron llamadas 21 personas. De ellas fueron recusadas motivadamente dos; perentoriamente seis por la defensa y una por el fiscal.

Lo que sigue es un resumen del examen *voir dire* de cada persona interrogada en el curso de la selección del jurado que finalmente juzgó el caso. Las identificaremos por sus iniciales. En parte citaremos textualmente sus contestaciones.

Al comenzar la defensa su turno sobre recusaciones motivadas preguntó, en forma general, a las doce personas que inicialmente ocuparon la tribuna del jurado, si alguno de ellos había tenido conocimiento de los hechos del caso con anterioridad al día en que empezó el juicio. Del récord aparece la siguiente contestación general: "Por la prensa." Pero interrogados seguidamente "¿Qué personas del jurado han tenido conocimiento de estos hechos por medio de la prensa?" únicamente respondieron los jurados A.R., J.M.R. y J.R.M. en la afirmativa.—t. 2–3.

J.M.R. interrogado por el letrado de la defensa Lic. Burgos Mundo, manifestó: Que leyó "algo con relación a los nechos de este caso"; fue la primera vez que salió la información; no formó opinión del caso; en su mente surtió el efecto de "una información general, como una noticia cualquiera"; no pesó en su ánimo el hecho de que la agresión fuera inferida a una mujer; no conoce cómo ocurrieron los hechos; leyó "la parte más importante: el título y algo más"; no conoce a la señora Emma Pujals; no recuerda haber visto fotografías con relación al caso; no formó opinión sobre el mismo; no le había causado ningún efecto la ola de escalamientos y de robos en Puerto Rico, "porque es corriente que se lee eso en la prensa, de que se roba, de que se mata y todo eso"; está en condiciones de juzgar el caso exclusivamente a base de la prueba que se practicara; que para él

todo dependería de las declaraciones de los testigos; si de la prueba que presentara el fiscal surgía que el acusado no era culpable, en su ánimo no pesaría el hecho adicional de que el acusado no ofreciera prueba en su defensa y lo condenaría o absolvería "de acuerdo con la prueba que el fiscal presente." "Hay veces que la misma prueba (la del fiscal) favorece al acusado"; si había duda, la duda siempre favorece al acusado; tiene 54 años de edad.—t. 3–5.

Este jurado actuó en el juicio celebrado.

J.R.M. A preguntas de la defensa manifestó: Cree haber leído los hechos de este caso en la prensa; en dos o tres ocasiones; no recuerda haber visto fotografías en la prensa con relación al caso, pero sabe que leyó "la primera noticia, cuando por primera vez se publicó el suceso de que había sido una dama agredida"; no conocía ni al acusado ni a la dama; no discutió con persona alguna la noticia; no formó opinión; leyó "la información como cualquiera otra noticia"; no es costumbre suya formar opinión de lo que se dice en la prensa; "uno lee una información y se entera del suceso; pero en cuanto a mí, no hago conclusiones porque el periodista que da la información está sujeto a lo que alguien le diga, y a lo mejor está diciendo algo que no es cierto; pero que da la información de buena fe, y uno entonces no va a determinar por la mera lectura de un periódico la opinión respecto a un caso"; uno va a juzgar a un ciudadano que haya tenido una entrevista con un periodista y luego venga a defenderse en corte; no lo vamos a juzgar por lo que haya dicho al periodista, sino por la prueba que se presente aquí en la corte." —t. 5–7.

Este jurado también actuó en el juicio celebrado.

J.G.C. Preguntado por la defensa manifestó: Leyó el titular de la información de la prensa; no la leyó en su fondo; no formó opinión por la lectura del titular; no conoce a la señora Pujals, ni tampoco a Olga Calzada, ni a los señores José Díaz Hernández, Manuel González Seijo, Antonio

Rosario, Petra Quiñones vda. de Pujals, teniente José A.
Rivera, Rafael Santiago Carmona, capitán Jorge Camacho,
cabo José Martínez, sargento Francisco, capitán A. Palmer
López.— t. 5–8.

Este jurado actuó definitivamente en el caso.

Al interrogar, en general, a todos los jurados si alguno
de ellos conocía a las personas antes nombradas, sólo el jurado
Juan R. Molina contestó: "sé quién es el capitán Cama-
cho, y el señor Ramírez Brau y al señor González Seijo lo
conozco." —t. 8.

En su turno sobre recusaciones motivadas, la única pre-
gunta que formuló el fiscal fue "¿Las damas y caballeros del
jurado están en condiciones de juzgar los hechos únicamente
por la prueba que desfile y que [se] admita en este caso?"
No hubo contestación negativa. La defensa, en ese momento,
recusó perentoriamente cuatro jurados. El secretario com-
pletó el panel, comenzando otra vez el turno de recusaciones
motivadas de la defensa respecto a los cuatro nuevos jurados
llamados. —t. 9–10.

R. M. vda. M.—A preguntas de la defensa, manifestó:
Que leyó los titulares de la información que la prensa dio
sobre el caso; no lo comentó con persona alguna; el hecho
que hubiera una mujer envuelta en el caso no causaría efecto
alguno en su ánimo; tiene 51 años de edad.

Esta señora fue recusada perentoriamente por la defensa.
—t. 10.

E. R. R.—A preguntas de la defensa, manifestó: Que no
leyó información de prensa sobre el caso; no conoce los tes-
tigos que aparecen al dorso de la acusación; tampoco a la
señora Emma Pujals, ni a sus familiares.—t. 11.

Esta señora también fue recusada perentoriamente por
la defensa, agotándose entonces sus seis recusaciones peren-
torias. Art. 223 Código de Enjuiciamiento Criminal.

J. R. M.—A preguntas de la defensa, manifestó: Que
leyó algo en la prensa relacionado con el caso; fueron varias

las informaciones que leyó pero no formó opinión respecto al caso.—t. 11.

Este señor, de nombre José Rivera Mundo, fue recusado perentoriamente por el fiscal.—t. 11.

Fueron llamadas otras cuatro personas para completar el panel de jurados.

M. F. M.—Esta señora a preguntas de la defensa, manifestó: Que tenía 49 años de edad; para la época en que ocurrieron los hechos estaba en Nueva York; supo algo del caso por "El Diario de Nueva York"; leyó solamente el titular "sobre el caso de este señor que había agolpeado a la señora"; no conoce a la señora Emma Pujals ni a algún familiar de ésta; que el hecho de haber leído "lo que leyó" no pesaría en su ánimo para juzgar el caso, aunque "trataría" de pesar la prueba que se presentase; su estado de ánimo sería en contra del acusado por estar en el mismo envuelta una dama.—t. 13.

La defensa la recusó entonces motivadamente. El juez preguntó a esta señora si por el solo hecho de que la perjudicada fuera una mujer, ella encontraría al acusado más culpable, y contestó: "Seguramente que lo encontraría más culpable." —t. 14.

Se declaró con lugar su recusación motivada.

G. N. A.—Manifestó a preguntas de la defensa: Que tiene un comercio en San Juan; no conoce a la señora Emma Pujals ni a ninguno de sus familiares; juzgaría el caso con toda imparcialidad no obstante estar envuelta en el caso una mujer; leyó información sobre el caso "el día que salió la información"; después no leyó nada; la leyó "como acostumbro leer todas las noticias de la prensa, sin hacer juicio de nada"; a pesar de ser un delito de sangre no se interesó en particular en el caso porque no podía saber "si la persona que cometiera el delito fuera culpable"; y que "eso no se puede saber hasta que se ve todo el caso"; que eso no quiere decir hasta que se termine la información de la prensa, sino

"hasta que se sienta aquí el acusado y desfila una prueba completa, tanto de la defensa como de El Pueblo"; no ha formado opinión previa por el hecho de haber leído información sobre el caso con anterioridad; la forma cuando el caso termina; si sale convicto el acusado "entonces es que yo creo que es culpable"; cuando viene a servir como jurado viene dispuesto a sacrificarse en algo para el Estado y cuando para ello lo llaman es porque lo necesitan; aunque está encargado de su negocio en las horas que se desprende de él (para servir como jurado) está dispuesto a cumplir con el deber que se le impone y no piensa en que ello pudiera causarle algún daño a su negocio.—t. 14–16.

Este señor formó parte del jurado que entendió en la causa.

J. V. O. A.—A preguntas de la defensa, contestó: Que no leyó (información periodística) en relación a los hechos del caso que se ventilaba; en esos días estaba en el campo y no leyó nada; recibe la prensa en el campo, pero no siempre; para la fecha de los hechos no la recibió y no recuerda haber leído la prensa para esa fecha; no sabe cuándo ocurrieron los hechos; lleva sirviendo como jurado dos años; para el primero de enero de 1955 actuaba como jurado; a veces estaba tres, cuatro y cinco días sin ver los periódicos; vive en el barrio "Gloria", de Trujillo Alto; actuaría de acuerdo con la prueba y a pesar de estar envuelta una mujer ello no influiría en su ánimo; si el acusado le demostraba que era inocente "santo y bueno para mí." Al preguntarle la defensa que si el fiscal no demostraba la culpabilidad del acusado más allá de una duda razonable, tendría que presentarle (al jurado) evidencia el acusado para su inocencia, contestó que sí; y cuando se le preguntó cómo actuaría al someter el caso el acusado por la prueba del fiscal, contestó: "De alguna manera tendrá que demostrar que es inocente," y que en caso de que no se lo demostrara que es inocente lo condenaría "desde luego." —t. 16–18.

La defensa recusó motivadamente a este jurado. El fiscal no se opuso. El tribunal declaró con lugar la recusación motivada.—t. 18.

A. V.—A preguntas de la defensa, contestó: Que había leído sobre los hechos del caso en el periódico El Mundo; "el encabezamiento nada más"; no formó opinión de los hechos; no leyó información alguna con relación al acusado; y repite que sólo leyó "el encabezamiento" de la información que dio El Mundo. Entonces le preguntó la defensa: "¿Leyó usted con relación a una especie de confesión de este acusado?" y él contestó: "No, señor." Cuando se le pregunta qué fue lo que leyó en la prensa, contestó "que a una señora le dieron con una tranca"; que no siguió el caso a través de la prensa todos los días porque no tiene tiempo, está en sus ocupaciones, es secretario de una corporación y tiene que estar ocupado; a la hora de almorzar le da tiempo a la lectura; la primera vez leyó "la prensa con relación a los hechos del caso; vio alguna fotografía en el periódico; mira así" las noticias; no recuerda la fotografía que vio; podría ser que la viera pero no recuerda; no recuerda cuándo leyó la información porque lo que leyó fue el encabezamiento como antes le había dicho; no pesaría en su ánimo el hecho de que estuviera envuelta en el caso una mujer.—t. 19-21.

También este señor formó parte del jurado.

Mientras se examinaba a este jurado ocurrió lo siguiente:

"(Defensor) —¿Usted lee el periódico todos los días?
—Bueno, no recuerdo.
—¿Entonces posiblemente vio alguna fotografía publicada en relación con este caso?
—Podría ser; pero en realidad no recuerdo.
—¿Específicamente, con relación al 4 de enero, cuando apareció inicialmente la información, usted leyó esa información?
—No sé si fue ese día . . .
—Examine esto.
"Fiscal: Señor juez, eso no se puede hacer.
"Juez: Con lugar.

"Defensor: *Era para mostrarle al jurado una información periodística.*

"Juez: No lo puede hacer; con lugar la objeción.

. . . . . . . . .

"Defensor (Dr. Amadeo): Señor juez, tomamos excepción de la resolución de Su Señoría cuando el compañero *trató de mostrarle al jurado lo que publicó el periódico.*

"Juez: ¿Qué era eso que se le mostraba?

"Defensor: *La fotografía.*

"Juez: Ahora se la puede mostrar. Ahora, si desean los compañeros, cuando llegue el turno de prueba de la Defensa, también pueden mostrar la publicación; presentarla, mejor dicho. Como quieran.

"Defensor: Pues está bien, señor juez.

"Juez: Presten los caballeros del jurado últimamente llamados el juramento definitivo." —t. 21-22. (Énfasis suplido.)

Así quedó finalmente constituido el jurado, de cuyos miembros siete personas (M.O., M.I., J.A., L.M., A.R.D., E.A. y J.G.G.) *no fueron en modo alguno interrogados por la defensa o por el fiscal.* Ni aun se les preguntó si habían visto o leído los titulares.

### III

Comenzó luego el período de presentación de las pruebas. De los diez y seis testigos citados por el fiscal, éste ofreció solamente los testimonios de cinco de ellos poniendo sus demás testigos a disposición del acusado.—t. 83. Como evidencia física o material ofreció El Pueblo y fueron admitidas, sin objeción de la defensa, siete radiografías tomadas a la víctima (Exhibit 1, t. pág. 34) y el "cuartón de madera" (Exhibit 2, t. 83) identificado como el instrumento usado por el acusado en la comisión del crimen por los testigos Manuel González Seijo—t. 65—y Francisco A. Orona—t. 74 —y cuyas manchas analizó el perito Rafael Santiago Carmona—t. 76-78.

Cuando el fiscal terminó la presentación de su prueba, la defensa solicitó la suspensión del juicio hasta el siguiente día, 17 de junio, debido a que le faltaba uno de sus testigos.

El tribunal accedió a la suspensión y ordenó la citación de ese testigo. En la mañana siguiente se reanudó la sesión y fue llamado el caso para la continuación del juicio en el turno de presentación de la evidencia por el acusado. En ese momento sus abogados expusieron al tribunal: "Señor juez, vamos a someter nuestro caso *con la prueba presentada por el fiscal.*" Al preguntar el juez si la defensa no iba a exponer su teoría, contestaron los letrados: "No, señor juez. Sometemos el caso." —t. 85–86. Siguieron las instrucciones al jurado.

## IV

La prueba que tuvo ante sí y consideró el jurado, resumida correctamente por el juez en el curso de sus instrucciones, fue como sigue:

"La prueba del fiscal consistió, primero en la declaración del doctor Ismael Ruiz, quien declaró que presta servicios en el Hospital Municipal de Río Piedras y en la Escuela de Medicina; que es cirujano; que el primero de enero de 1955 estaba en el Hospital de Río Piedras e intervino con Emma Pujals Quiñones como a las once y treinta de la noche; que ésta, al examen que él le practicó, presentaba varias heridas en la cabeza; una contusión en la región occipital, profunda, en forma de triángulo, de seis pulgadas por cuatro pulgadas; una herida lacerada de carácter profunda, en la región parietal media, y otra herida lacerada profunda en la región fronto-parietal, que medía dos pulgadads—en total, en la cabeza, tres heridas. Que ella estaba en estado de shock por pérdida de sangre y presión sanguínea baja, y sin conocimiento; y que la estuvo atendiendo hasta el día 13 de marzo de 1955, habiendo estado la paciente inconsciente durante catorce días. Les mostró el testigo a las damas y caballeros del jurado, en el cuerpo de Emma Pujals, el sitio de las heridas que él describió, declarando que ella también presentaba una contusión sobre el hombro, el codo y la mano izquierda, con fuerte equimosis, que explicó que era extravasación de sangre de los tejidos; que las tres heridas presentaban una fractura del cráneo desde la órbita del ojo izquierdo hacia atrás de la cabeza. Declaró que se tomaron placas radiográficas y éstas

fueron identificadas y ofrecidas luego como prueba; que Emma Pujals perdió la visión del ojo izquierdo y que, además, tartamudea actualmente, debido a que se le afectó el área del cerebro que controla el habla; y que las heridas eran graves. Admitió que la herida de la región occipital hubiera producido la pérdida del conocimiento, así como también cualquiera de las otras heridas sufridas por la paciente en la cabeza.

"Declaró la supuesta víctima en este caso, Emma Pujals Quiñones, y dijo que reside en Floral Park, en Hato Rey, y trabajaba para el día primero de enero de 1955 como secretaria de la Colecturía Federal, desde hacía más de cuatro años. Que la noche del primero de enero de 1955 ella estaba en Río Piedras visitando a una amiga, y venía en una guagua de la Autoridad de Transporte hacia su casa, de Río Piedras, para buscar a su mamá, quien estaba en su casa, esperándola, y a una sobrinita, con el propósito de ir a pasarse la noche del primero de enero, Año Nuevo, con sus hermanos; que dejó la guagua en la parada de Ruiz Belvis; que venía sola, bajó sola de la guagua, y seguía caminando sola hacia su casa con el propósito antes indicado; que cogió por la cuneta frente a la acera de la derecha, viniendo de la parada, hacia su casa, y cuando iba por allí, sintió pasos de una persona que venía detrás de ella; pero que no miró hacia atrás, y que cuando llegó frente a la Iglesia del Espíritu Santo, sintió que le daban un golpe sobre el hombro izquierdo que le causó un susto; que alzó y movió su mano derecha, del susto, y miró entonces hacia atrás y vio a un hombre; que a ese hombre lo miró ella y no sabía por qué le había dado; que entonces vinieron los otros golpes que le dieron en la cabeza y la dejaron inconsciente hasta el golpe fatal que recibió y cayó; que no puede decir más después que cayó inconsciente; que el hombre que le dio los golpes está presente en este tribunal, y señaló al acusado como el autor de dichos golpes. Dijo que vestía de pantalón azul marino oscuro y camisa blanca; que el primer golpe fue el que ella vio; que cuando miró al acusado después del primer golpe, lo vio con el palo en las manos, un palo como de tres pies, más o menos. Reconoció el palo como un palo que era así; y declaró, además, que había bastante claridad en el sitio; que nunca había visto al acusado antes de ese momento, ni lo conocía; que el segundo golpe lo recibió después de pasar dos o tres minutos, pero que fue rápidamente; que pudieron ser segundos, después del primer golpe

y de ella mirar; que ella caminaba sin espejuelos ese día; que los tenía en la cartera porque tiene un padecimiento de la vista, que ve más de la cuenta; que no tiene dificultad en ver de cerca, sino en ver de lejos. Que no hubo discusión ni palabras con el hombre, de ninguna clase; que no es cierto que el acusado le hubiese pedido la hora y ella le hubiese dicho, "yo no le hablo a nadie que no conozco." Que el primer golpe lo sintió ella bárbaramente, y que entonces el acusado le arrebató la cartera y entonces vinieron los demás golpes; que quien le arrebató la cartera fue el acusado, el mismo que le dio, y que no había allí nada más que una persona, además de ella; que quizás dio algún quejido, pero no habló.

"Declaró el señor Manuel González Seijo y dijo que el primero de enero de 1955 vivía en la calle Caribe y Matienzo, en la esquina; que estaba en casa de una sobrina de él como hasta las once de la noche ese día primero de enero; declaró que alguien le llamó la atención de que un hombre estaba arrancándole la antena del automóvil suyo, que estaba allí al frente; que fue y le señalaron al hombre y él se montó en el automóvil y siguió al hombre, parándose en la Calle Duarte, donde le preguntó qué hacía, y el hombre le contestó que nada; que ese hombre caminaba con una tranca en forma de yugo, con las manos puestas así en esta forma; que le cogió el palo y se lo botó a la cuneta y le dijo, 'No sigas andando con esa tranca, que te va a coger la policía;' que entonces fue a montarse al carro para irse, y en ese momento el hombre dijo, 'No, yo cojo otra vez la tranca para defenderme de tantos borrachos que andan por ahí' y cogió la tranca de donde él la había tirado; que se fue a su casa, y al regresar se encontró con un yip de la policía alumbrando el sitio frente a la Iglesia Espíritu Santo y preguntó qué pasaba, y en virtud de lo que le informaron, indicó a la policía el incidente que le había ocurrido con el hombre de la estaca, y que al siguiente día como a las dos de la madrugada le llevaron a un individuo para identificar el sargento de la policía y el dueño del Chicken Inn. Que no lo identificó, y dijo que no era ése, y que más tarde le llevaron la estaca y la identificó; que el hombre que llevaba la estaca y con quien él se encontró esa noche fue el acusado en este caso, que tenía pantalón oscuro y una camisa blanca como la que tiene puesta en el tribunal; que no tiene duda alguna de que es el acusado el hombre a quien él vio; que lo vio nuevamente cuando

se lo llevó el capitán de la policía para identificarlo como a los cuatro o cinco días de los hechos. Que lo identificó inmediatamente e identificó otra vez la estaca o cuartón que fue admitida como prueba; declarando el testigo que no tiene duda alguna de que fuera esa misma la estaca. Dijo que vio al acusado en el sitio donde hay un foco; que habló con él debajo de dicho foco, y habló con él escasamente cinco minutos; que no es cierto que declarara al policía José Díaz Hernández en presencia del señor Ramírez Brau que él no podía identificar al hombre del palo el sábado 2 de enero a las nueve y treinta de la noche; que no conoce al policía José Díaz Hernández; que el acusado se identificó con él esa noche, sacó su cartera o trató de sacarla y le dio su nombre; pero que él no recordó su nombre, y luego recordó que era Alejandro Dumas; que el acusado no llegó a abrir la cartera; pero que le dijo que vivía en la Calle Martí número 114.

"Luego declaró Francisco A. Orono, quien dijo ser sargento de la policía de Hato Rey; que lo era para el día 1ro. de enero de 1955; que cuando recibió noticias de los hechos de este caso, mandó a dos policías al sitio y luego fue él al propio sitio de los hechos y empezó a investigar con los vecinos, una de apellido Cestero, y otra de apellido Calzada, quienes viven al frente y al lado del sitio de los hechos; que ocupó un pedazo de madera, que identificó como el cuartón presentado como prueba por el fiscal en este caso, el cual estaba escondido al lado de un tronco y entre unos hibiscos en un solar contiguo, y estaba impregnado en sangre. No pudo decir qué clase de sangre era, si animal o humana; pero que era sangre; que la olió.

"Declaró Rafael Santiago Carmona, quien dijo ser químico de la policía, y la defensa aceptó su capacidad como tal químico. Dijo que recibió el cuartón de madera que identificó; que tenía manchas de sangre que estaban a una altura de diez y seis pulgadas desde la punta y hasta el otro extremo; que examinó las manchas de sangre y encontró que eran de sangre humana, determinando por un método químico que explicó, que era sangre del grupo sanguíneo A; que le mandaron un tubo de ensayo que contenía sangre que se decía ser de Emma Pujals Quiñones, y también determinó el testigo que el grupo sanguíneo de esa otra sangre era también del grupo A, y que eran homólogas o idénticas. Declaró que también examinó ciertas piezas de evi-

dencia, como una faja de mujer con sangre humana tipo A
también; ·unas hojas de árboles y ramas, que también encontró
ser del tipo de sangre humana A; una enagua, estilo can-can,
con igual resultado, esto es, con sangre humana del tipo A;
medias y zapatos, los cuales no contenían sangre; una colcha,
también con igual resultado, y un traje de mujer negro, *strap-
less*, también con igual resultado. El fiscal ofreció como prueba
y fueron admitidas, las radiografías y el cuartón de madera a
que se ha hecho referencia, identificados por los testigos."

## V

Entre las instrucciones trasmitidas al jurado se encuen-
tran las relativas a: (*a*) la obligación del jurado de rendir
veredicto exclusivamente a base de la prueba presentada;
(*b*) la obligación del fiscal de probar la culpabilidad del acu-
sado con todos los elementos que la ley exige—que fueron
luego indicados—y más allá de toda duda razonable; (*c*) la
existencia de la presunción de inocencia; (*d*) el derecho del
acusado a abstenerse de declarar; (*e*) la obligación del jurado
de declarar no culpable al acusado si entendían: que no se
había cometido delito alguno o que de haberse cometido no
había sido el acusado su autor o si tenían duda razonable y
fundada acerca de su culpabilidad.—t. 93–99.

Cuando terminó el juez sus instrucciones preguntó al
fiscal y a los letrados de la defensa si tenían alguna instruc-
ción especial que proponer. Ambas partes contestaron nega-
tivamente.—t. 100.

## VI

El 17 de junio rindió el jurado un veredicto unánime de
culpabilidad por el delito imputado. Se aceptó por el tri-
bunal dicho veredicto y se declaró convicto al acusado.

La defensa solicitó el aplazamiento del pronunciamiento
de la sentencia por diez días y le fue concedido.—t. 101.
El 27 de junio presentó su moción pidiendo la anulación del
proceso y veredicto y la concesión de un nuevo juicio, antes
transcrita. Fue señalada para discutirse el 12 de julio si-
guiente. Al comenzar en este día la vista se solicitó su pos-

posición por la defensa a los fines de citar como testigos al redactor de "El Mundo" Enrique Ramírez Brau y al redactor de "El Imparcial" Frank Rodríguez. El tribunal concedió la posposición, señaló de nuevo la vista para el 8 de agosto y ordenó la citación de ambos testigos.

El 8 de agosto se celebró la vista de la moción. La defensa se limitó a ofrecer como evidencia en apoyo de su moción tres recortes de periódicos, dos de "El Mundo" y uno de "El Imparcial". Sin oposición del fiscal fueron admitidos. No ofreció la defensa otra clase de evidencia. El fiscal, por su parte, no presentó evidencia alguna. Con la sola presentación de esos tres recortes de periódicos, cuyos textos se insertaron en la moción, quedó sometida la moción. El 14 de octubre de 1955 el juez dictó la resolución denegando en todas sus partes la moción en los términos que ya transcribimos.

La precedente exposición—extensa por necesidad—de los hechos y circunstancias concurrentes en cada etapa y momento del proceso criminal en que se juzgó al apelante Alejandro Dumas Márquez, podría considerarse como el más preciso y suficiente fundamento para concluir que nunca en el curso de cada etapa o momento del proceso sus derechos constitucionales fueron efectivamente violados, y que al contrario, plenamente disfrutó de un juicio imparcial y justo. Empero, creemos necesario pasar sobre las diversas cuestiones suscitadas en el alegato presentado por los distinguidos letrados de la defensa.(1)

_____

(1) El Pueblo no ha suscitado la improcedencia de esa solicitud de nuevo juicio a base de conducta impropia del fiscal. En varios casos interpretando el art. 303 del Código de Enjuiciamiento Criminal, hemos resuelto que determinadas conductas impropias de fiscales—la aquí alegada es haber permitido la publicación de la supuesta confesión y no haberla presentado en evidencia—no constituyen motivo legal para ordenarse, por los tribunales de primera instancia, un nuevo juicio.—*Pueblo* v. *Serbiá*, 78 D.P.R. 788, 791 (1956); *Pueblo* v. *Reyes*, 76 D.P.R. 296, 298, 301 (1954); *Pueblo* v. *Fraticelli*, 70 D.P.R. 308, 310 (1949); *Pueblo* v. *Vega*, 69 D.P.R. 406, 408 (1948).

444

En substancia podemos concurrir con la defensa en cuanto a sus siguientes afirmaciones: (1) que la prensa diaria de Puerto Rico a principios de enero de 1955, le dio publicidad a los hechos imputados al apelante; (2) que el ministerio fiscal y funcionarios de la policía contribuyeron a esta publicidad; (3) que fue objeto de esa publicidad una supuesta confesión del acusado; (4) que el fiscal no presentó en evidencia la supuesta confesión del acusado; (5) que "el único testimonio que conectó 'directamente' al apelante con la comisión del delito fue el de la víctima"; (6) que la jurisprudencia del Tribunal Supremo de Estados Unidos ha sostenido que los efectos del "juicio en los periódicos" pueden ser mitigados en varias formas, entre ellas, la de solicitar el traslado a otro distrito judicial y la de pedir la suspensión del juicio por algún tiempo; (7) que dicha jurisprudencia también ha condenado que los fiscales se conviertan en instrumentos de la prensa para juzgar a los acusados en el foro de la opinión pública sin las debidas garantías, y (8) que en el caso de *Shepherd* v. *Florida*, 341 U.S. 50, los jueces Jackson y Frankfurter fueron de opinión de que consideradas las circunstancias concurrentes en ese caso fue perjudicial a los derechos del acusado que el fiscal diera su confesión a la prensa para ser publicada y después no presentara esa confesión al celebrarse el juicio.

Hasta ahí llega nuestra posible concurrencia con el apelante. Las afirmaciones que rechazamos por no estar conformes con los hechos probados, o con el derecho aplicable, o con la dirección doctrinal de la jurisprudencia establecida sobre la materia, o con los dictados de una sana crítica, son las que siguen: (*a*) que el Ministerio Fiscal, en este caso específico, "usara a la prensa del país como instrumento para dar publicidad a los hechos"; (*b*) que el testimonio de la perjudicada no fuera convincente para relacionar al acusado con la comisión del delito que se le imputó; (*c*) que todos los jurados declararon "que ellos habían leído en la prensa

la información relacionada con el crimen, o sea la información transcrita en la moción"; (*d*) que era el deber del fiscal traer a juicio y presentar la confesión hecha por el acusado; (*e*) que la publicación de la confesión causó impresión en el ánimo del jurado que actuó en el juicio; (*f*) que ni el traslado a otro distrito ni la posposición del juicio eran eficaces para mitigar los efectos del juicio en los periódicos; (*g*) que en este caso la conducta del fiscal al no presentar la confesión del acusado privó al apelante del derecho a un juicio imparcial; (*h*) que para poder presentar el fiscal la supuesta confesión del acusado para contradecirlo, dicho fiscal no estaba obligado a probar previamente su voluntariedad. Veamos.

 (*a*) Ni durante el juicio, ni en la vista de la moción sobre nuevo juicio, la defensa probó en forma alguna, que el fiscal usara a la prensa del país como instrumento para dar publicidad a los hechos ni que él iniciara una campaña "fuera-del-tribunal" para conseguir la convicción del acusado. A pesar de que citó a los redactores de "El Mundo" y de "El Imparcial" para prestar testimonio en la vista de la moción, no los utilizó para demostrar ese extremo. Es cierto que el periódico "El Imparcial" publicó dos fotografías con la información que dio el viernes 7 de enero de 1955, en las que aparece el fiscal, en unión al acusado, y que al pie de una de ellas se lee: "Bajo el interrogatorio del fiscal . . . quien le muestra la estaca utilizada para agredir a Emma Pujals, el ex-jockey Alejandro Dumas Márquez se confiesa autor de los hechos en el Cuartel de la Detective de San Juan", y en la otra: "Alejandro Dumas (derecha) firma su confesión ante el fiscal." Pero ello, por sí solo, no demuestra que efectivamente "el fiscal usara a la prensa como instrumento" para la publicación de los hechos. Lo más que puede inferirse de las fotografías y del texto de las mismas—ante la ausencia de una repudiación pública por parte del fiscal de esas informaciones—es que el fiscal permitió que se tomaran y que con sus respectivos textos se publi-

caran. ¿Quién invitó a la prensa para tomar esas fotografías? El récord no lo dice. ¿Fue el fiscal el que dictó o sugirió los textos de ellas? Tampoco lo dice el récord.

En las informaciones sobre los detalles del crimen y la supuesta confesión, —con excepción de su posible móvil—no se le atribuyen al fiscal informaciones sobre los detalles del crimen o sobre esa confesión, ni mucho menos su opinión o creencia sobre la culpabilidad del acusado. Fueron los propios redactores Ramírez Brau y Rodríguez los que publicacaron sus versiones sobre los hechos, tales como los narraba o confesaba, según ellos, el propio acusado y como resultado de sus propias investigaciones o pesquisas. Es cierto que de esas informaciones se desprende que el fiscal, en alguna forma que claramente no surge de esas publicaciones, contribuyó con su conducta de tolerancia a que los redactores de esos diarios se enteraran ampliamente de la supuesta confesión del acusado.

Aunque el fiscal no usara a la prensa como instrumento para dar publicidad a los detalles del crimen con el fin calculado de perjudicar las garantías constitucionales que protegían al acusado, su conducta al permitir que los fotógrafos de la prensa lo fotografiaran con el acusado en los momentos en que éste prestaba ante él una declaración sobre los hechos y en el momento en que firmaba una supuesta confesión, fue no solamente impropia sino ilegal. La conclusión a que llegamos en el sentido de que esa conducta, en este caso específico, fue neutralizada por otras circunstancias, no la hace menos impropia o menos ilegal.

El art. 3 del Código de Enjuiciamiento Criminal preceptúa que el fiscal deberá presentar su acusación "en sala de justicia", no al público, a través de la prensa o por cualquier otro medio de publicidad; el art. 11 del mismo cuerpo legal dispone que el examen de testigos por el promotor fiscal "se hará privadamente", no ante el público, ni ante reporteros,

redactores o fotógrafos de la prensa o personas extrañas a la investigación que practique.

El fiscal no puede convertirse en un agente publicitario. Su misión investigativa o acusativa no lo faculta para promover, alegar o estimular la publicación de las declaraciones, testimonios o confesiones extrajudiciales que obtiene en el curso de su labor de investigación de los hechos. No debe convertirse en un partícipe consciente en los llamados "juicios por periódicos". Lo mismo puede decirse respecto a los abogados defensores en causas criminales, pues la política de abstinencia opera en ambas direcciones.(2)

En *Pueblo* v. *Fournier*, 77 D.P.R. 222, 297 (1954) sobre la publicidad con antelación a juicios, en parte nos expresamos así:

"No existen soluciones fáciles en la tarea de proteger tanto la libertad de prensa como el derecho de un acusado a un juicio justo e imparcial. Los dos intereses que en alguna forma

---

(2) Entre las recomendaciones especificadas formuladas en el "Informe del Comité del Gobernador para el Estudio de los Derechos Civiles en Puerto Rico", publicado en agosto de 1959, por la Editorial Colegio de Abogados de Puerto Rico, a la página 186, se encuentran las siguientes:

"6. Deben aplicarse con rigor las disposiciones legales que definen como delitos las actuaciones de funcionarios públicos en violación de derechos y debido procedimiento.

. . . . . . . .

"10. El problema de la publicidad indebida de las investigaciones practicadas por los fiscales y otros funcionarios públicos, así como de los casos pendientes ante los tribunales ha adquirido proporciones realmente graves. Esta gravedad se acentúa porque los abogados de los acusados han incurrido con igual o mayor frecuencia en práctica tan indeseable.

"Los fiscales, funcionarios policíacos y abogados de los acusados deben abstenerse de recurrir a la prensa para crear ambiente favorable o desfavorable, según sea el caso, a las personas investigadas o acusadas.

"Los acusados tienen derecho a un juicio justo e imparcial. Los funcionarios no deben dar información al público que pueda poner en peligro este derecho. Por otro lado, los abogados de los acusados no deben, amparándose en la protección de los derechos de éstos, incurrir en la práctica que condenamos en el caso de los funcionarios públicos. Ambas partes deben litigar sus respectivos derechos ante los tribunales y no ante la opinión pública."

Nuestro Secretario de Justicia, Hon. Hiram R. Cancio, preocupado por la seriedad del problema, cursó en enero de 1960, una circular a

deben balancearse han sido descritos por el Juez Frankfurter en su opinión en *Maryland* v. *Baltimore Radio Show, Inc., et al., supra,* como sigue a la pág. 920: 'Una de las exigencias de una sociedad democrática es que el público sepa lo que ocurre en los tribunales mediante información de la prensa de lo que allí ocurre, a fin de que el público pueda juzgar si nuestro sistema de derecho penal es justo y correcto. Por otro lado, nuestra sociedad ha separado la corte y el jurado como el tribunal para determinar la culpabilidad o la inocencia *a base de evidencia presentada en corte,* hasta donde sea humanamente posible.' (Bastardillas nuestras.) Este problema fue recientemente explorado en un cuidadoso artículo escrito por Jerome H. Spingarn titulado 'Newspapers and the Pursuit of Justice' que apareció en *The Saturday Review,* del 3 de abril de 1954, pág. 9. Después de exponer ilustraciones de los sensacionales e incriminatorios incidentes de un caso pendiente en la ciudad de Nueva York, Spingarn indica que 'No será fácil . . . encontrar jurados cuya imparcialidad no haya sido violada. Hay muy pocas personas en la ciudad que no hayan leído acerca de la 'confesión', que no sepan o crean que sepan, todo detalle del acto criminal, que no hayan especulado con los motivos. ¿Y habrá algunos que no hayan formado sus opiniones con res-

todos los fiscales y fiscales auxiliares de Puerto Rico, sobre la publicidad indebida de las investigaciones fiscales, que en lo pertinente dice así:

"He notado que en algunas ocasiones ha habido un despliegue extraordinario de publicidad en relación con ciertas investigaciones realizadas por fiscales en casos criminales.—Sin que se entienda que los fiscales deban entorpecer en forma alguna la gestión informativa de la prensa, deseo recabar la cooperación de todos y cada uno de ustedes en el sentido de que sus informaciones a los periódicos se limiten a aquellos datos estrictamente necesarios para dar a conocer el suceso que se investiga. —*Es altamente indeseable que se dé a la publicidad los nombres u otra información relativa a los confidentes.* Sé que ninguno de ustedes revelaría, conscientemente, datos de esta naturaleza. Pero les invito a tomar precauciones para evitar que terceras personas puedan enterarse y darle publicidad. Ello puede traer perjuicio innecesario a personas que han prestado su cooperación a las autoridades en la investigación de un hecho. —Una indebida publicidad de las investigaciones practicadas por los Fiscales puede, en determinado caso, afectar la objetividad con que la opinión pública enfoca las circunstancias del mismo, lo que indudablemente puede crear prejuicios a una buena administración de la justicia penal.—Me parece propio referirme al dictum del Honorable Tribunal Supremo de Puerto Rico en el caso de *Pueblo* v. *Fournier,* 77 D.P.R. 222, 299:

" 'Los casos deben juzgarse en las cortes, no en los periódicos antes del juicio. De esto surge que los abogados de los acusados así como

pecto a la culpabilidad y no hayan aún calibrado la clemencia con la cual calmarían la justicia? . . . Nada malo hay en la publicación de información propiamente dicha . . . Pero tal lectura antes del juicio y de la convicción podría ser un lujo que no debemos gastarnos si al mismo tiempo vamos a mantener nuestra garantía constitucional de que los acusados se presumirán inocentes hasta que se les pruebe que son culpables y de que serán juzgados ante un jurado imparcial.' "

■ (*b*) ¿Fue convincente el testimonio de la perjudicada para relacionar al acusado con la comisión del delito? Sin duda alguna, lo fue. Su declaración, en lo pertinente es como sigue:

(Examen directo) :

"P. ¿Qué usted hizo al sentir esa cosa dura sobre el hombro izquierdo, que le dio?

R. Eso me causó susto, y moví la mano así, y miré.

P. ¿Cuando miró, qué vio?

R. Vi al hombre con un palo, que me dio.

P. ¿Cómo era ese palo?

R. Un palo gordo, grueso, así y así. Entonces yo hice así y miré y lo vi.

---

los Fiscales normalmente deben abstenerse de dar a la publicidad evidencia que esperan presentar en corte. . . .

" 'Todo el problema de lo que ha sido llamado "juicio en los periódicos" es uno muy serio bajo nuestras condiciones modernas de comunicaciones en masa. . . . Sólo por cooperación y entendimiento mutuos entre los abogados y los periódicos pueden ambos principios fundamentales—la libertad de prensa y el derecho de un acusado a un juicio justo e imparcial— ser eficazmente conservados.'

"Quiero señalar, además, que una de las recomendaciones del informe del Comité del Gobernador para el estudio de los derechos civiles en Puerto Rico plantea este asunto:

" 'Los Fiscales, funcionarios policíacos y abogados de los acusados deben abstenerse de recurrir a la prensa para crear ambiente favorable o desfavorable, según sea el caso, a las personas investigadas.'

"Les encarezco la mayor adherencia a los principios anteriormente expuestos, pues considero que, sin lugar a dudas, constituyen la mejor norma a seguirse en relación con la publicidad de las investigaciones de casos criminales.

"Les instruyo que en el futuro observen ustedes extraordinario celo en mantener dentro de la mayor discreción las investigaciones que practiquen, . . ."
Véase el Canon 20 de la Ética Profesional, 48 D.P.R. XV.

P. ¿Cómo era ese hombre?

R. A ese hombre lo vi y lo miré. Solamente el susto, porque no sabía por qué era, y entonces miré para atrás y entonces vinieron los otros golpes.—t. 44.

. . . . . . .

P. Tenga la bondad y dígales a las damas y caballeros del jurado quién fue ese hombre que le dio ese primer golpe a usted en el hombro y luego esa serie de golpes que la dejaron a usted inconsciente.

R. *El hombre que yo miré y vi, el hombre que me dio aquí, es ese hombre que está presente.*

P. ¿Quién es el hombre ése? Tenga la bondad de señalarlo.

R. *Ese señor.*

Fiscal: *Señalando al acusado.*

P. *¿Ese señor que está aquí?*

R. *Sí, señor.*

P. ¿Ese fue el señor que le dio los golpes a usted esa noche?

R. Sí, señor, que me dio.

P. Tenga la bondad de decir cómo vestía ese hombre que usted ha señalado como el que le dio a usted los golpes.

R. El señor que me dio el primer golpe, el que yo vi . . . ese hombre estaba vestido de oscuro, como con unos pantalones azul marino oscuro y una camisa blanca. Y el palo en las manos.—t. 45–46.

. . . . . . .

P. *¿Y el hombre que le dio esos golpes a usted es quién, Emma?*

R. *Ese señor que está ahí, Dumas Márquez.*

P. *¿Está aquí?*

R. *Sí, señor.*

P. *¿Dónde está sentado?*

R. *Ese señor que está ahí.*

P. *¿El acusado?*

R. *Sí, señor.*—t. 47.

. . . . . . .

Repregunta:

Defensor: P. ¿Usted había visto al señor Dumas con anterioridad a esa fecha?

R. Nunca lo había visto. Nunca lo había conocido personalmente, no.

P. ¿O sea, la primera vez que usted lo ve es la noche de los hechos?

R. Sí, señor.

P. ¿Qué tiempo transcurrió entre usted recibir el primer golpe hasta que recibió el segundo golpe?

R. Podrían ser dos o tres minutos del primero al segundo.

P. ¿Entonces usted recibió el primer golpe y después el otro?

R. Fue rápidamente porque cuando miré lo que hubo fueron golpe y golpe y golpe.

P. ¿Entonces fueron minutos? ¿O segundos?

R. O sea segundos.

P. ¿Y usted en ese tiempo pudo ver la ropa que vestía el acusado o la persona que le tiró a usted y ver usted también a la persona que era?

R. Lo vi al primer golpe; lo vi cómo estaba: que tenía el palo, que estaba vestido con una camisa blanca y unos pantalones oscuros o azul marino.

P. ¿O sea, en una fracción de segundos usted pudo tener la oportunidad de examinar la ropa que llevaba esa persona, y notar que llevaba un palo—en un sitio bastante oscuro?

R. Cuando yo estaba allí frente a la iglesia, allí no hay tanta oscuridad; precisamente porque ahora no es como estaba hace años.

P. Pero no es un sitio bastante claro; no es como la luz del día. ¿ . . . ?

R. No, señor, no es como la luz del día; pero es distinto, porque cuando uno mira uno ve.

P. ¿Y usted, a una persona que no ha visto nunca, que es la primera vez que la ve; en esas condiciones, recibiendo un golpe, en fracciones de segundos usted dice que podía ver a la persona ésa que le dio a usted?

R. *Pues sí, lo vi. Fue la única vez que yo lo miré, y lo vi."*

Algunos pasajes esenciales del testimonio de la perjudicada fueron corroborados por la declaración del testigo Manuel González Seijo, que en parte es como sigue:

"¿Y quién era el individuo del incidente ése de la estaca, de la calle Duarte, con quien estuvo usted y a quien usted le preguntó qué hacía por allí?

R. Este joven que está aquí.

Fiscal: Señalando a Alejandro Dumas Márquez.

P. ¿Cómo vestía él esa noche, si usted lo recuerda?

R. Vestía un pantalón así como el que tiene, más o menos.

P. ¿De qué color?

R. Un color azul.

P. ¿Y qué más?

R. Y una camisa también como la que tiene, blanca.

P. ¿Lucía chaqueta?

R. No, señor.

P. ¿Lucía sombrero?

R. No, señor.

P. *¿Usted está positivamente seguro de que éste era el hombre que andaba con la estaca ésa aquella noche?*

R. *Absolutamente.*

P. *¿No tiene dudas de eso?*

R. *En absoluto, no, señor."*

■ (c) ¿Declararon todos los jurados que ellos habían leído en la prensa la información relacionada con el crimen o sea la información transcrita en la moción? Ninguno de los miembros del jurado afirmó categóricamente que había leído en la prensa toda la información relacionada con el crimen. Del resumen del *voir dire* que antes hemos hecho resulta:

Los jurados M.O., M.I., J.A., L.M., y A.R.D. fueron llamados con el primer grupo de jurados examinados. Cuando la defensa preguntó: "¿Qué personas del jurado han tenido conocimiento de estos hechos por medio de la prensa?" —t. 2—ninguno de estos cinco primeros jurados manifestó tener tal conocimiento. Los jurados E.A. y J.G.G., llamados después para completar el jurado, no fueron interrogados en forma alguna, y mucho menos respecto a informaciones de la prensa.

Los restantes cinco jurados, J.M.R., A.R., J.R.M., G.N.A. y A.V. fueron los únicos interrogados sobre informaciones de la prensa y que manifestaron, y en los términos que expusimos en el resumen, que habían leído "algo" en la prensa,

o "el encabezamiento" o "los titulares", pero que no lo recordaban, que no conocían al acusado ni a la perjudicada, que no habían formado opinión sobre el caso y que rendirían veredicto a base de la prueba que presentaran las partes. A.V. fue el único que dijo haber visto una fotografía en los periódicos, pero que no la recordaba.—t. 21.

Por ello, no es correcta enteramente la afirmación que el juez de instancia hizo en el segundo párrafo de su Resolución denegando el nuevo juicio, en el sentido de que *todos* los jurados fueron "ampliamente" preguntados sobre si habían o no leído la prensa en relación con los relatos que se hacían sobre el caso.

██ (d) ¿Estaba obligado el fiscal a traer a juicio y presentar la confesión hecha por el acusado?

El récord no demuestra el texto o contenido de la llamada confesión del acusado. Tenemos una idea de su existencia y contenido por las fotografías y noticias publicadas por la prensa. El acusado nunca pidió copia de la misma o que se le mostrara o que se le permitiera examinarla. No se nos ha puesto en condiciones de determinar si en realidad se trata de una confesión o de declaraciones incriminatorias o exculpatorias, o de una combinación de ambas.

La defensa fue la única parte que hizo mención de tal confesión y durante la constitución del jurado, cuando, en el *voir dire* del jurado A.V., le preguntó: "¿Leyó usted con relación a una *especie de confesión de este acusado?*" El jurado le contestó que no.—t. 19.(3)

---

(3) Esa pregunta nos hizo recordar la parte de la exposición del caso hecha por el tribunal de instancia, transcrita en la opinión disidente, en el caso de *Maryland* v. *Baltimore Radio Show*, 338 U.S. 912, 916 (1950) que en su idioma original dice:

"The suggestion was made here also, that the mischief could have been avoided by exercising the right of the Defense to examine, on their voir dire, all prospective jurors and then inquiring as to whether or not they had heard these broadcasts. Well, now, it hardly seems necessary

No hemos podido encontrar precepto constitucional o estatutario, ni doctrina jurisprudencial, que en circunstancias idénticas o similares a las del presente caso obligue al fiscal a ofrecer y presentar en el juicio tal confesión.

Sobre este punto dijo el tribunal a quo:

"El Fiscal ofreció prueba testifical de testigos presenciales, como la propia agredida, y otros testigos que vieron al acusado en los alrededores del sitio y además declararon sobre detalles y circunstancias. El Fiscal no presentó como prueba una confesión del acusado. Si la tenía, creyó prudente no ofrecerla. Quizás para evitarse discutir cualquier cuestión que pudiera levantar el acusado en cuanto a la publicidad que dicha confesión había tenido en la prensa. El acusado no presentó teoría ni prueba de clase alguna."

El apelante nos cita extensamente en su alegato la parte doctrinal de las decisiones de *Shepherd* v. *Florida*, 341 U.S. 50 (1951) y *Stroble* v. *California*, 343 U.S. 181 (1952). Los principios que ambos casos sostienen han surgido en el decurso de la enconada e histórica lucha entre la prensa y la judicatura americanas, sobre la publicación sin restricciones de información sobre los procedimientos judiciales pendientes, invocando la primera la garantía constitucional de la libertad de expresión y la segunda los derechos constitucionales del acusado a un juicio en corte, imparcial y justo. La Corte Suprema federal ha reconocido el derecho de la prensa de comentar los procesos judiciales pendientes pero no como un derecho absoluto y capaz de ejercitarse en todas las formas o modos concebibles. También ha reconocido el derecho del gobierno federal y de los gobiernos de los estados a imponer restricciones a esa libertad de expresión, pero no como un derecho absoluto que autorice toda clase de restricciones. Ha reconocido también que un acusado puede ser

---

for the Court to say to men who are experienced in the trial of jury cases, that every time Defense Counsel asked a prospective juror whether he had heard a radio broadcast to the effect that his client has confessed to this crime or that he has been guilty of similar crimes, he would by that act be driving just one more nail into James' coffin."

privado de su derecho a un juicio imparcial y justo cuando una publicidad adversa en los periódicos sobre su caso real y seriamente ha prejuiciado en su contra la comunidad.([4])

La diversidad de criterios expresados, las diferentes soluciones, fórmulas o pruebas (tests) ofrecidas, las distintas posiciones judiciales adoptadas sobre el problema, parece que hasta el presente no han sido adecuadas para fijar una línea de separación precisa, permanente y de universal aceptación cuando esas garantías constitucionales entran en conflicto.([5])

Pero dudamos mucho que se encuentre algún precedente que sostenga que la mera publicidad de una confesión dada con más de cinco meses de anterioridad al juicio, permitida o alentada por un fiscal que en el juicio no la presentó como evidencia, constituya por sí sola, fundamento de derecho, para invalidar todo un proceso criminal y hacer fatalmente imperativa la concesión de un nuevo juicio. Esta es la situación precisa en este recurso en el que el acusado se sometió voluntariamente a ser juzgado por un jurado, y luego de rendirse un veredicto condenatorio alegó, por primera vez, que su derecho a un juicio imparcial y justo le fue violado por la publicidad adversa que casi seis meses antes se había dado a la supuesta confesión que no se ofreció en juicio, limitándose en la vista de la moción simplemente a ofrecer como prueba los recortes de periódicos ya relacionados.

---

([4]) *Times Films Corp.* v. *Chicago,* 365 U.S. 43 (1961), especialmente las opiniones ·disidentes del Juez Presidente, Sr. Warren, págs. 50–78 y del Juez Douglas, 78–84; *Maryland* v. *Baltimore Radio Show Inc.,* 338 U.S. 912 (1950), opinión del Juez Frankfurter; *Adamson* v. *California,* 332 U.S. 46 (1947); *Craig* v. *Harney,* 331 U.S. 367 (1947); *Pennekamp* v. *Florida,* 328 U.S. 331 (1946); *Bridges* v. *California,* 314 U.S. 252 (1941); *Gitlow* v. *New York,* 268 U.S. 652 (1925); *Moore* v. *Dempsey,* 261 U.S. 86 (1923); *Toledo Newspaper Co.* v. *United States,* 247 U.S. 402 (1918). *Contempt by Publication,* 59 Yale L. J. 534.

([5]) *"Contempt by Publication",* supra, escolios 5–9, págs. 536, 537; *"Inflamatory Pre-Trial Release by the Prosecutor and the Due Process Clause",* 47 N.W.U.L.R. 728; *"Controlling Press and Radio Influence of Trials",* 63 Harv. L. Rev. 840; *"When the Press Collides with Justice",* 34 J.Am.Jud. Society 46; *Ex parte Craig,* 282 Fed. 138.

Se expresó en la opinión mayoritaria del caso de *Stroble* v. *California*, supra, a la página 198:

"Como se dijo en *Adams* v. *United States ex rel McCann*, 317 U.S. 269, 281 (1942) :

'Si el resultado del proceso adjudicador no debe ser desdeñado—is not to be set at naught—no es pedir demasiado que el peso de demostrar una injusticia esencial sea sostenido por el que alega tal injusticia y pretende que se deseche ese resultado, y que lo sostenga no como una cuestión de especulación sino como una realidad demostrable.' "

Es cierto que la opinión concurrente en *Shepherd* v. *Florida*, supra, consideró como impropia y perjudicial la conducta del fiscal al no ofrecer como evidencia la supuesta confesión de los acusados publicada por la prensa, y que ellos habían dado, según información atribuida al "sheriff" que los custodiaba. Sin embargo, esa conducta no fue el único factor tomado en cuenta para llegarse en dicha opinión concurrente a la conclusión de que a los acusados nunca se les juzgó por el debido proceso de ley. La prueba demostró la siguiente red de hechos y circunstancias:

El 16 de julio de 1949 una joven blanca de 17 años de edad informó a la policía que había sido violada, a punta de pistola, por cuatro hombres de color, en el Condado del Lago, Estado de Florida. Seis días después esos cuatro hombres fueron acusados. Se les celebró juicio el primero de setiembre siguiente a tres de ellos—al mes y medio de la supuesta violación—; uno de ellos había sido muerto en el acto de hacer resistencia a su arresto. Dos de los cuatro acusados fueron declarados convictos, sin recomendación de clemencia y sentenciados a muerte. El otro, un menor, escapó a la última pena por recomendación de clemencia para él.

Mientras estaban custodiados por el "sheriff" éste informó a la prensa que los tres detenidos habían confesado la comisión del delito. La prensa le dio publicidad a la confesión así informada. Entonces una muchedumbre tumultuosa y

enfurecida rodeó la cárcel donde ellos estaban y demandó la entrega de los acusados. Por orden de la corte fueron trasladados a la prisión del estado donde permanecieron unas dos semanas antes del juicio. Mientras tanto la muchedumbre quemó la casa donde vivían los padres del acusado Shepherd y otras dos casas de personas de color. Todas las personas de color de la comunidad fueron trasladadas a otro lugar para evitar su linchamiento. La Guardia Nacional fue llamada a servicio de emergencia durante tres días y un regimiento de artillería fue traído desde Tampa. Mucha gente de color abandonó sus hogares y huyó. Cada detalle de esos sucesos fue informado por la prensa con grandes titulares, como *"NIGHT RIDERS BURN LAKE NEGRO HOMES"* y *"FLAMES FROM NEGRO HOMES LIGHT NIGHT SKY IN LAKE COUNTY."* Información grandemente perjudicial se publicaba en la prensa mientras el gran jurado investigaba, incluyendo un dibujo—*cartoon*—en que se pintaban cuatro sillas eléctricas bajo un gran titular que decía: *"NO COMPROMISE—SUPREME PENALTY."*

Los abogados de los acusados presentaron dos mociones, una para que se suspendiera la celebración del juicio hasta que se calmaran los ánimos y la otra solicitando el traslado de la causa para otro condado. Ambas fueron denegadas.

Al confirmar la sentencia la Corte Suprema de Florida hizo la observación de que "El sentimiento público encendido era en contra del crimen del cual eran acusados los apelantes antes que contra su raza."

En el acto del juicio, el juez que lo presidía, estaba preocupado sobre posibles actos de violencia durante el juicio. Promulgó reglas especiales limitando el número de espectadores, prohibiendo ocupar los pasillos y escaleras; ordenó que los elevadores no fueran usados por el público excepto por personas con un permiso especial para usarlos; ordenó que cada persona fuese registrada al entrar a la corte; prohibió que cualquier persona que entrara al tribunal llevase "valijas,

bolsas, maletas, canastas, botellas, jarros, botijas, cubos, paquetes, líos y cualquier otro artículo similar"; permitió que se llevaran muletas, cañas y bastones solamente si después de ser inspeccionados por el "sheriff" resultaban ser de ayuda necesaria para sus portadores; prohibió toda clase de demostraciones públicas. Al "sheriff" le impuso la responsabilidad del cumplimiento de esas órdenes y lo autorizó para emplear el número de auxiliares que necesitara para esos fines.

En el juicio los testigos y personas llamadas como jurados manifestaron que ellos habían leído u oído las informaciones publicadas por la prensa. El editor de uno de los periódicos explicando la fuente de la cual había obtenido la información que dio en su periódico sobre la confesión, dijo que la había basado en varios artículos publicados por otros periódicos y en conversaciones que había sostenido con el "público en general."

En la opinión concurrente del Juez Jackson, con la cual estuvo conforme el Juez Frankfurter, se dice que las precauciones que tomó el juez de primera instancia demostraban la reacción que la atmósfera que permeaba el juicio creó en su mente; que dicho juez tuvo que sentirse impotente para proteger a los acusados contra la campaña fuera-de-la-corte para obtener su convicción; que tales convicciones no respondían a ninguna concepción civilizada del debido proceso de ley; que el juicio se había celebrado bajo condiciones que negaban a los acusados un juicio justo ante cualquier clase de jurado y que el caso presentaba "one of the best examples of one of the worst menaces to American justice."—pág. 55.

Consignó el Juez Jackson que las únicas explicaciones racionales para la no presentación de la confesión eran: que la confesión era falsa, o que se había obtenido bajo circunstancias que la hacían inadmisible, o que su presentación era inoportuna.—pág. 51.

En el caso de *Stroble* v. *California*, supra, los hechos, resumidos, fueron los siguientes: En la mañana del 15 de noviembre de 1949, y detrás de un incinerador que estaba en el patio del hogar de una hija de Stroble, en la ciudad de Los Ángeles, se encontró el cuerpo de una niña de seis años de edad. Estaba envuelto en una sábana y cubierto por unas cajas de cartón. Alrededor de su cuello se encontró una corbata y cerca del cadáver una hacha, un cuchillo y un martillo. La autopsia reveló que la niña había muerto de asfixia por estrangulación, que había sido sexualmente atacada y que su cuerpo presentaba seis fracturas del cráneo, una laceración profunda en su cuello y tres heridas punzantes en el pecho.

Seis meses antes Stroble había sido denunciado por molestar a una niña. Prestó fianza, pero al ser llamado el caso para juicio no compareció. Se había dado a la fuga sin que hasta entonces fuera aprehendido. Se le había visto visitando la casa de su hija el día antes de aparecer el cadáver de la niña estrangulada, o sea el 14 de noviembre. Sobre él recayeron sospechas del asesinato. En la mañana del 17 de noviembre, mientras Stroble entraba a un restaurante de la parte baja de Los Ángeles, una persona lo reconoció como el hombre buscado en relación con el asesinato de la niña, y dio cuenta a la policía de que Stroble se encontraba allí. Vino el policía Carlson y lo arrestó. Se le condujo en un automóvil de la policía a la oficina del fiscal. Mientras era así conducido Stroble informó a la policía que había dado muerte a la niña. Ante el fiscal auxiliar y unas diez y nueve personas más, Stroble prestó una extensa declaración en que confesaba la comisión del crimen y exponía los detalles del mismo.

Fue acusado de asesinato en primer grado. Contra la acusación formuló alegaciones de no culpable y no culpable por razón de locura. Durante las seis semanas transcurridas entre la lectura de la acusación y el juicio fue examinado

por cuatro siquiatras y un sicólogo clínico. A cada uno de ellos Stroble informó que había dado muerte a la niña y dio los detalles del crimen.

Antes del juicio el fiscal dio a la prensa información sobre la confesión que en su oficina había hecho el acusado y le expresó su opinión de que Stroble era culpable del horrendo crimen que se le imputaba, que lo había cometido en su sano juicio y que continuaba en su sano juicio.

Las informaciones del fiscal y todos los sórdidos detalles del delito fueron extensamente publicados por la prensa, la radio y la televisión. Como consecuencia de esta publicidad la comunidad en que se realizó el crimen fue afectada por un clima de histeria y de intenso sentimiento adverso al acusado. Los titulares del "Los Angeles Herald Express", de 18 de noviembre de 1949—tres días antes de la vista preliminar y 47 días antes de comenzar el juicio—decían: "Lynch Him! Howls Crowd as Stroble Goes to Court." La circulación promedio diaria de los periódicos que comentaban el caso era de 1,200,000 ejemplares.

La búsqueda y aprehensión del acusado fue precedida por una gran publicidad del caso en los periódicos. Hablaban de la "cacería humana" que conducía la policía. Grandes titulares describían a Stroble como un "werewolf", "a fiend", "a sex-mad killer" y en términos parecidos. Aunque con menos intensidad, el despliegue noticioso sobre el caso continuó en los días siguientes. El Gobernador del estado convocó la legislatura a sesión especial para considerar, entre otras cosas, el problema de los "crímenes sexuales"; ante una comisión legislativa que investigaba los "crímenes sexuales" en la ciudad de Los Ángeles, compareció el fiscal y declaró que él no veía el motivo por el cual no se disponía de los criminales sexuales de la misma forma en que se disponía de los perros rabiosos. Los periódicos de esa ciudad publicaron artículos sobre estos acontecimientos, relacionándolos con el asesinato que se imputaba a Stroble. Las incidencias

del juicio, que empezó el 3 de enero de 1950 y terminó el 19 del mismo mes, fueron publicadas por la prensa, llamándose de vez en cuando al acusado "werewolf." La prensa tomó fotografías de escenas del juicio que luego se pasaban por televisión al público. La evidencia ofrecida en el juicio consistió principalmente en las declaraciones dadas por Stroble a los policías mientras era conducido a la oficina del fiscal, la confesión dada por él en la oficina del fiscal y sus declaraciones a los cinco doctores que lo examinaron antes del juicio. Ninguna de estas confesiones fue impugnada por la defensa a base de involuntariedad. Stroble fue convicto y sentenciado a muerte. La Corte Suprema de California confirmó la sentencia. Ante la Corte Suprema de Estados Unidos pidió su revocación alegando que se le había violado su derecho al debido proceso de ley, fundándose en cinco motivos, y, entre ellos, el de que los reportajes inflamatorios de la prensa, inspirados por el fiscal, había hecho imposible la celebración de un juicio justo e imparcial.

El Juez Clark emitió la opinión mayoritaria del tribunal que confirmó la sentencia de la Corte Suprema de California. Los Jueces Frankfurter y Douglas emitieron, por separado, opiniones disidentes.

En esa opinión mayoritaria se llega a la conclusión de que todas las confesiones de Stroble fueron voluntarias y su admisión como evidencia fue correcta. Se censuró en ella la conducta del fiscal al dar a la publicidad los detalles de la confesión, pero se aceptó que esa confesión que se había ofrecido durante la vista preliminar cuatro días después, se había hecho disponible una vez así ofrecida, "for what transpires in the court room is public property"—pág. 193—y que, por otro lado, el peticionario no había demostrado que la publicación de esos detalles de la confesión cuatro días antes de la vista preliminar había prejuzgado al jurado en la determinación del veredicto dos meses después. Entendió también la mayoría del tribunal que el peticionario tampoco

había probado que los artículos publicados habían producido tal prejuicio en la comunidad que evitara necesariamente la celebración de un juicio justo e imparcial. Se hizo notar que ninguno de los abogados del acusado, que lo defendieron con extraordinario celo, pidió el traslado del caso a otro condado por imposibilidad de obtenerse la celebración de un juicio imparcial y justo debido a publicidad adversa.

Su párrafo final respecto a este punto es como sigue:

"La cuestión sobre publicación adversa en los periódicos fue primeramente traída de la atención de la corte de instancia después de la convicción del peticionario como uno de los fundamentos para sostener la moción de nuevo juicio. En ese momento, el actual abogado del peticionario alegó que éste había sido 'privado de la presunción de inocencia mediante la entrega prematura por la oficina del fiscal, de los detalles de la confesión', y ofreció para sostener esa alegación algunos recortes de periódicos de Los Ángeles publicados al tiempo del arresto del peticionario. El tribunal de instancia dijo lo siguiente:

" 'Todos los jurados fueron ampliamente examinados y todos definitivamente hicieron constar que le darían al acusado el beneficio de la presunción de inocencia . . . No hay nada que demuestre que estos jurados alguna vez vieron o leyeron estos periódicos. Ellos fueron completamente examinados sobre este aspecto y hasta el punto en que lo quiso el abogado defensor, en cuanto a cualquier conocimiento o información que pudieran haber tenido sobre el caso.'

"El peticionario no impugna esta expresión del tribunal. Aun más, en ninguna etapa del procedimiento, el peticionario ofreció tanto como una declaración jurada para probar que cualquier jurado estaba de hecho prejuiciado por las historias de los periódicos. Simplemente solicita de esta Corte que lea esas historias y después declare, por encima de los dos pronunciamientos en contrario de dos cortes estatales, que ellas necesariamente le privaron del debido proceso de ley. Eso no lo podemos hacer, por lo menos cuando, como aquí, los relatos inflamatorios de los periódicos aparecieron aproximadamente seis semanas antes del comienzo del juicio, y no existe una demostración afirmativa de que algún prejuicio en la comunidad existió alguna vez, o que en cualquier forma afectó la deliberación del jurado. Es significativo que en este caso la

confesión que fue de los más prominentes rasgos de los relatos periodísticos fue hecha voluntariamente y presentada en el juicio."—págs. 194, 195.

Si el fiscal, independientemente de la supuesta confesión, tenía suficiente evidencia para probar la comisión del delito y obtener la convicción del acusado, no vemos la razón que lo obligara a presentar en juicio, además, la supuesta confesión publicada.—*Robinson* v. *United States*, 128 F.2d 322; *In re Curtis*, 123 Fed. 936; *Fielding* v. *United States*, 164 F.2d 1022.—Por otra parte, la defensa no nos ha alegado que la confesión fuese falsa o involuntaria. Si la confesión era falsa o involuntaria, y el fiscal tenía conocimiento de ello, hizo muy bien en no ofrecerla como evidencia.

■ (*e*) La publicación de la confesión, ¿causó impresión en el ánimo del jurado que actuó en el juicio? Basta hacer referencia al anterior resumen sobre el examen que se hizo a las personas que fueron llamadas para constituir el jurado, para contestar negativamente esta pregunta. No hubo un solo jurado que dijera que recordaba las noticias publicadas por la prensa, o cuyos sentimientos, opiniones o criterios sobre el caso hubieran sido alterados, influenciados o impresionados por alguna publicidad adversa.

La defensa jamás demostró o intentó demostrar que después de los artículos publicados en enero de 1955, la prensa se ocupara del caso del acusado.

■ (*f*) El acusado no solicitó el traslado del caso para otro distrito. Tiempo para pedirlo tuvo de sobra desde el 10 de marzo, fecha de la presentación de la acusación hasta el 16 de junio de 1955, en que comenzó el juicio. Bajo el fundamento de que no podría obtener un juicio justo e imparcial o un jurado para el juicio, el acusado pudo haber obtenido el traslado de su caso.—Art. 171, Cód. Enj. Criminal.—Pero el acusado nos dice que el traslado no es un remedio eficaz en Puerto Rico contra una publicidad adversa debido a la pequeñez geográfica de Puerto Rico y al hecho

de que los dos periódicos principales del país son leídos en todos los distritos judiciales.

En el caso de Dumas Márquez, si es que hubo un verdadero juicio en los periódicos, quedó demostrado que ninguna impresión indeleble en la mente de los jurados del propio distrito en que se cometió el delito causó la publicidad adversa. El jurado quedó constituido en la mañana del primer día de juicio. Se llamaron solamente 21 personas para constituirlo. Quedó demostrado que no se trataba de un caso que hubiese adquirido gran notoriedad. Ningún jurado conocía al acusado ni a la perjudicada. Los pocos que, casi seis meses antes, habían leído "algo", "los titulares" o "el encabezamiento", ni siquiera recordaban lo que habían visto o leído en la prensa. Uno de los jurados declaró que "no era costumbre suya formar opinión de lo que se dice en la prensa" y "no hago conclusiones porque el periodista que da la información está sujeto a lo que alguien le diga, y a lo mejor está diciendo algo que no es cierto"—t. 5–7.

Si ésa era la situación en el distrito de San Juan para el 16 de junio, en los demás distritos el caso disfrutaba de una menor notoriedad o, quizá, de ninguna. En esas condiciones, muy difícil le hubiera sido obtener el traslado a otro distrito, ya que, el acusado tenía que demostrar la imposibilidad real y efectiva de obtener en San Juan un juicio imparcial y justo o un jurado para su juicio. Como dijimos en *Pueblo* v. *Collazo*, 33 D.P.R. 583, 585 (1924):

"Generalmente la clase de prejuicio local que da lugar a un juicio injusto se manifiesta aun en el momento del juicio, o ha habido un verdadero clamor público, o un movimiento violento contra el acusado o alguna otra demostración pública y notoria."

La presunción es que no hay prejuicios.—Cf. *Maldonado* v. *Corte*, 71 D.P.R. 537, 542 (1950); *Pueblo* v. *Collazo*, supra, pág. 586.

La publicidad adversa puede considerarse o no causa para el traslado, cuando ella ha creado una atmósfera de prejuicios, odios y pasiones contra el acusado o contra el Estado que sostiene la acusación.—Cf. *People* v. *Mendes*, 35 C.2d 537, 219 P.2d 1 (1950) ; *People* v. *Yeager*, 194 C. 452, 229 Pac. 40 (1924) ; *People* v. *Sueser*, 132 Cal. 631, 64 Pac. 1095 (1901).

En el caso de *Stroble*, supra, la opinión mayoritaria consideró como indicación de una falta de prejuicio en la comunidad el no haberse solicitado por sus abogados el traslado del juicio.—Pág. 194.

Como el derecho al traslado es opcional, está demás decir que el derecho constitucional a un juicio imparcial y justo en el distrito en que se perpetró el delito no queda renunciado por dejar de solicitar el traslado.

La posposición del juicio por el tiempo que razonablemente fuere necesario para que los ánimos se calmen y desaparezca cualquier estado de histeria pública contra el acusado es otro de los remedios reconocidos o aconsejados contra una publicidad adversa.—Cf. *Delaney* v. *United States*, 199 F.2d 107, 114 (1952). Los abogados de Dumas Márquez no solicitaron la suspensión del juicio por esa razón. Sin embargo, en 23 de mayo de 1955 solicitaron la suspensión del juicio para localizar ciertos testigos; el 16 de junio solicitaron la posposición del juicio hasta el siguiente día para entrevistar testigos que el fiscal había puesto a su disposición; el 12 de julio solicitaron la suspensión de la vista de la moción sobre nuevo juicio para obtener la citación de dos testigos. En mayo 17 y en 6 y 14 de junio de 1955 presentaron mociones para que el tribunal ordenara la citación para juicio de cuatro testigos que calificaron como testigos "esenciales para su defensa." Todo ello nos demuestra que casi a los seis meses de haberse publicado por la prensa las informaciones sobre el caso, no existía en la mente de sus abogados ni una razonable aprehensión de que su defendido no pudiera obte-

ner un juicio imparcial y justo o un jurado para su caso. La posposición del caso, para el 16 de junio, era innecesaria, por razones de prejuicio.

 (g) ¿Privó el fiscal al apelante de su derecho a un juicio imparcial al no presentar en el juicio la supuesta confesión?

La defensa no ofreció prueba alguna de que el acusado hubiera sido privado de un juicio imparcial y justo, bien por la no presentación de la llamada confesión o bien por cualquier otra causa. Argumenta que si el fiscal hubiera ofrecido en evidencia la confesión, la defensa hubiera tenido la oportunidad de impugnar la voluntariedad de la misma y así eliminar de la mente de los jurados la impresión que les pudo haber causado su publicación en la prensa. Si quedó demostrado claramente que ninguno de los jurados tenía opinión formada en el caso por informaciones de la prensa o por cualquier otro medio, que le impidiese considerar el caso sólo a base de la evidencia que se ofreciera en el juicio, ninguna necesidad tenía el acusado de demostrar la involuntariedad de una confesión que se desconocía o no se recordaba.

Por otra parte, repetimos, el apelante no da una sola razón para sostener que la supuesta confesión era falsa o involuntaria, ni afirma que contaba con evidencia suficiente para demostrar su involuntariedad.

Si bien censuramos la conducta del fiscal al permitir que la prensa publicara detalles de la confesión que diera ante él el acusado, y que se tomaran fotografías del acto de la firma de tal confesión y por practicar una investigación en presencia de redactores y fotógrafos de la prensa y de personas extrañas al proceso, no podemos dejar de reconocer la limpieza, escrupulosidad y rectitud de su conducta respecto a dicha confesión durante el juicio. Ni en la exposición de su teoría ante el jurado ni durante el interrogatorio a sus testigos, hizo la más leve mención, alusión o referencia a dicha confesión. Es más, en los momentos en que se cons-

tituía el jurado, se opuso a que la defensa le mostrara al jurado las fotografías publicadas en la prensa. Sometió su caso al jurado renunciando a su informe principal, sin comentarios ni argumentación alguna, descansando exclusivamente en la prueba que había aportado.

También los letrados de la defensa observaron durante la presentación de la evidencia y en el curso de sus repreguntas una conducta de suma discreción y prudencia respecto a la alegada confesión del acusado.

Si el acusado optó por no declarar, ni presentar prueba alguna y someter su caso por la prueba del fiscal, ésa fue la alternativa estratégica de su preferencia. Si la prueba aportada por El Pueblo, cuya suficiencia no se cuestiona realmente, fue creída por el jurado y considerada por éste bastante para rendir un veredicto unánime de culpabilidad, ésa fue una exclusiva función del jurado en cuya selección participó el acusado. Si finalmente resultó una equivocada táctica de defensa el acusado no puede quejarse de ello.

Por todo ello entendemos que la no presentación de la supuesta confesión no privó al acusado de un juicio imparcial y justo.

▆▆▆ (h) La tesis del apelante de que fue forzado a no declarar, porque si declaraba el fiscal podía contradecirlo con su confesión sin tener que probar previamente su voluntariedad, privándosele así de un juicio imparcial y justo, es insostenible.

La doctrina de que una confesión de un acusado no puede admitirse en su contra hasta que se pruebe su voluntariedad tiene su base principal en el precepto consagrado en la Enmienda Quinta de la Constitución federal y en la Sección 11 del Artículo II de nuestra Constitución, de que nadie será obligado en ningún caso criminal a incriminarse mediante su propio testimonio. Este fundamental principio no puede ser violado con impunidad en forma directa o indirecta. Está

presente en todo momento o instante del proceso y, principalmente en el período de presentación de prueba.

Aun cuando el fiscal ofrezca la declaración incriminatoria en contra del acusado no como una confesión propiamente dicha, sino como una mera declaración contradictoria para refutar el testimonio del acusado, el fiscal tiene la obligación ineludible de demostrar previamente la voluntariedad de la supuesta declaración contradictoria del acusado.

En *Ladner* v. *State*, resuelto el 3 de junio de 1957, por la Corte Suprema de Mississippi, 95 So.2d 468, 470, se dijo:

"El mayor peso de la autoridad sostiene la regla de que un acusado en un proceso criminal que declara como testigo en su propio beneficio no puede ser obligado en el contrainterrogatorio a testificar en cuanto a declaraciones hechas por él fuera de la corte que constituyan una confesión del crimen, a menos que primeramente se demuestre que esa confesión fue voluntaria; a pesar del hecho de que la evidencia se ofrezca por el fiscal no como una confesión, sino meramente como una declaración contradictoria, con el propósito de refutar al acusado como testigo en su propio beneficio. Anotación 9 A.L.R. 1358; 58 Am. Jur., *Witnesses,* Par. 773, pág. 423; Wharton's *Criminal Evidence,* 11th ed. sec. 360. pág. 68; *People* v. *Hiller,* 2 Ill.2d 323, 118 N.E.2d 11. Una minoría reconoce lo contrario. *Brown* v. *State,* 243 Ala. 529, 10 So.2d 855; *State* v. *Fisher,* 108 Mont. 68, 88 P.2d 53; *Com.* v. *Tolliver,* 119 Mass. 312.

"Esta cuestión parece nueva en esta jurisdicción. Si la regla minoritaria tiene algunos méritos que la justifican, no podemos discernirlos. En contrario, hay razones que nos obligan a favorecer la regla mayoritaria. La admisión de una confesión involuntaria es la negación de las garantías del debido proceso de ley. Las razones para excluir como evidencia una confesión involuntaria se aplican con igual fuerza cuando la confesión es ofrecida con el propósito de contradecir. La confesión es tan perjudicial como incompetente al ser ofrecida en una forma como en la otra. El hecho de que el acusado preste testimonio a su favor no convierte en admisible en su contra evidencia incompetente. En principio, al Estado no se le debe permitir hacer cualquier uso de una confesión involuntaria. Resolver lo contrario sería permitir al Estado usar toda con-

fesión, no importa lo involuntaria que fuese, siempre que el acusado testificara a su favor, sencillamente preguntándole sobre ella, y si el acusado admite que hizo tal confesión, o si lo niega, el Estado la ha probado por la vía de impugnación."

El apelante descansa en lo resuelto en *Walder* v. *United States*, 347 U.S. 62. Pero ese caso no sostiene su contención. En él se resolvió que era admisible como evidencia de impugnación el testimonio de un funcionario que al hacer un allanamiento y registro ilegal, en una ocasión no relacionada con el caso que se ventilaba, descubrió narcóticos en la posesión del acusado. Ese testimonio fue ofrecido con la finalidad de refutar la declaración del mismo acusado, quien había enfáticamente afirmado que jamás había tratado con o poseído narcóticos. Se trataba, pues, de manifestaciones de conocimiento personal y directo, aunque ilegalmente adquirido, de la realidad de un hecho y tendente a impugnar directamente la veracidad de una afirmación absoluta del acusado, en un punto colateral al caso.

A pesar del gran esfuerzo que el apelante ha hecho para situar el presente recurso dentro de la órbita constitucional, lo cierto es que le ha faltado el impulso de una demostración efectiva de un prejuicio u otro elemento indebido, cuyos efectos realmente privaran al acusado de un juicio imparcial y justo. Su recurso ni llegó a la esfera de los posibles errores corrientes por abusos de discreción en la negativa de un nuevo juicio. Todas las circunstancias del proceso a partir de la radicación de la acusación demuestran que el acusado disfrutó a plenitud de sus derechos constitucionales y estatutarios y que su convicción no fue el resultado de algún "juicio en los periódicos" si es que tal juicio alguna vez se efectuó. No se cometió el error imputado.

*Procede confirmarse tanto la sentencia condenatoria como la resolución denegando la concesión de un nuevo juicio.*